IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

UWM STUDENT ASSOCIATION, LENA-ROSE M. ABU SAIF,
ANDRES GABRIEL AGUILAR, ALLA R. AHMAD, JAMEELA
AL-ASMAR, EMMA BORKOWSKI, PHILIP A. COCHRAN,
GONZALO COUTO-LAIN, KEITH CRUM, ALAN D.
EISENBERG, PAUL GARNI, USMAN GHAFFAR, REBECCA L.
HADRIAN, FLAUNTAJIA HARRIS, BRITTNEY HENRY,
LAWRENCE W. IVORY, JR., SAMUEL A. JADIN, CASANDRA
JOHNSON, NORIELLE T. JOHNSON, KAYLA BRIANNE
KAPLAN, THOMAS KELLY, HEIDI W. LAGERMAN, DANIEL
S. LAUGHLAND, KARINA D. LEMPERT, REBECCA LILLIE,
BRENT LINDQUIST, MICHAEL LUDWIG, JONNELLI N.
NAVES-GONZALEZ, DHARA PAREKH, ALEX PARTEE,
SHREYA PATNAIK, SYED A. QADIR, VINCE CASIMIR
ROLBIECKI, ALIZAR S. B. SALEEM, TREVOR THOMAS
SCHERMERHORN, LEYTON SCHIEBEL, WILLIAM J.
SCHMIDT, TAYLOR Q. SCOTT, AHMED SHEHADEH,
MOHAMMAD SAMIR SIDDIQUE, RYAN THOMAS STETZ,
ANDREW CARLYLE URBAN, KIARA A. WILSON, and
KORINA YEE, for themselves, and others similarly situated,

        Plaintiffs,

v.                                                   Case No. 15-C-0001

DR. MICHAEL LOVELL, MARK A. MONE, BOARD OF
REGENTS – UNIVERSITY OF WISCONSIN SYSTEM, JOHN
BEHLING, MARK BRADLEY, JOSE DELGADO, TONY EVERS,
MICHAEL FALBO, MARGARET FARROW, EVE HALL,
NICOLAS HARSY, TIM HIGGINS, EDMUND MANYDEEDS,
REGINA MILLNER, JANICE MUELLER, DREW PETERSON,
CHARLES PRUITT, ANICKA PURATH, JOSE VASQUEZ,
DAVID WALSH, GERALD WHITBURN, STUDENT
ASSOCIATION AT UWM, DR. MICHAEL LALIBERTE, DAVID
STOCKTON, RICHARD R. THOMAS, THOMAS G.
McGINNITY, HEATHER HARBACH, PAHOUA XIONG, UW-
MILWAUKEE PUBLIC RECORDS CUSTODIAN, EDWARD C.
MELCHIOR, NICOLE HEINEN, CAMILLE RIDGEWAY,
ROBIN JENS, ANTHONY M. DEWEES, NIKOLAUS P.
RETTINGER III, CARLA GREVE, and RYAN SORENSON,

        Defendants.

THIRD AMENDED COMPLAINT

Now come the Plaintiffs, by and through their attorney GARY E. GRASS, and as and for their Third Amended Complaint against the Defendants, state as follows:

## INTRODUCTION

1.    This action seeks declaratory and injunctive relief based on defendants' unlawful interference with UWM students' rights under section 36.09(5) of the Wisconsin Statutes, and for denial of certain plaintiffs' civil rights and access to public records in the course of thereof.

## JURISDICTION AND VENUE

2.    Jurisdiction derives from federal questions presented, 28 U.S.C. § 1331. Supplemental jurisdiction, *id.* § 1367, applies to all other claims. There is also some diversity, *id.* § 1332.

3.    Venue is appropriate because most defendants reside in district, and the majority of events complained of occurred in the district. 28 U.S.C. § 1391(b)(1)-(2).

## PARTIES

### *Student Association*

4.    The Student Association ("SA") was a body politic of the state of Wisconsin, organized pursuant to section 36.09(5)[1] of the statutes. After 2013, two

---

[1] This statute has been recently amended, but the parts of the statute most relevant to this action, establishing students right to self-organize and set student fees, remain the same.

groups claimed to represent the continuation of the SA, the Plaintiff UWM Student Association ("PSA") and the Defendant Student Association at UWM ("DSA").

5. The DSA was organized in a process controlled by Defendants Lovell, Laliberte, DeWees, and Stockton, after May 29, 2013. It has operated since inception as the *de facto* UWM student government. Its principal offices are at Room EG79 of the UWM Union, 2200 East Kenwood Boulevard.

6. The PSA was formed in 2013-14 pursuant to section 36.09(5) of the statutes. After attempting to operate without access to power or resources and under attack from the administration, it became moribund after the filing of this action.

### *Individual Plaintiffs*

7. Individual plaintiffs are adult residents of the State of Wisconsin except for Dhara Parekh. All were University of Wisconsin – Milwaukee ("UWM") students at the times of particular events complained of. These Plaintiffs are:

(1) Lena-Rose M. Abu Saif ("Abu Saif"), 415 E. Estates Place, Oak Creek, Wisconsin 53145.

(2) Andres Gabriel Aguilar ("Aguilar"), 2961 N. Downer Ave., Milwaukee, Wisconsin.

(3) Alla R. Ahmad ("Ahmad"), 8467 S. Orchard View Ln., Oak Creek, Wisconsin.

(4) Jameela Al-Asmar ("Al-Asmar"), 1501 W Wanda Ave., Milwaukee, Wisconsin 53221.

(5) Emma Borkowski ("Borkowski"), 1806 E. Webster, Milwaukee, Wisconsin.

(6) Philip A. Cochran ("Cochran"), 1915 E. Kenilworth Place, Milwaukee, Wisconsin 53202.

(7)     Gonzalo Couto-Lain ("Couto-Lain"), 219 N. 38th St., Milwaukee, Wisconsin 53208.

(8)     Keith Crum, ("Crum"), 2313A N. Holton St., Milwaukee, Wisconsin 53212.

(9)     Alan D. Eisenberg ("Eisenberg"), 5123 N. Lake Dr., Whitefish Bay, Wisconsin 53211.

(10)    Paul Garni, ("Garni"), W6044 County Road N, Plymouth, Wisconsin 53073.

(11)    Usman Ghaffar ("Ghaffar"), 12069 N. Willow Glen Ct., Mequon Wisconsin 53092.

(12)    Rebecca L. Hadrian ("Hadrian"), 4220 S. Ravinia Dr. #102, Greenfield, Wisconsin 53221.

(13)    Flauntajia Harris ("Harris"), 1526 W. Groeling Ave., Milwaukee, Wisconsin.

(14)    Brittney Henry ("Henry"), 3027 N. 25th St., Milwaukee, Wisconsin, 53206.

(15)    Lawrence W. Ivory Jr. ("Ivory"), 5029 N. 31st St., Milwaukee, Wisconsin 53209.

(16)    Samuel A. Jadin ("Jadin"), 3363 Bay Heights Dr.,  Green Bay, Wisconsin.

(17)    CaSandra Johnson ("C. Johnson"), 905 W. Madison St.; Milwaukee, Wisconsin 53204

(18)    Norielle T. Johnson ("N. Johnson"), 3818 Saratoga Ct., Racine, Wisconsin 53405.

(19)    Kayla Brianne Kaplan ("Kaplan"), 2621 North Frederick Avenue #303, Milwaukee, Wisconsin 53211.

(20)    Thomas Kelly ("Kelly"), 1063 Westport Drive, No. 145, Port Washington, Wisconsin.

(21)    Heidi W. Lagerman ("Lagerman"), 10155 W. Forest Home Avenue, Apt. 204, Hales Corners, Wisconsin .

(22)    Daniel S. Laughland ("Laughland"), 517 N. 54th Street, Milwaukee, Wisconsin 53208.

(23)    Karina D. Lempert ("Lempert"), 10640 North Ivy Court #10, Mequon. Wisconsin 53092.

4

(24)     Rebecca Lillie ("Littie"); 2614 N. 74th Street, Wauwatosa, Wisconsin 53213.

(25)     Brian M. Linder-Elam ("Linder-Elam"), 5843 N. 64th St., Milwaukee, Wisconsin.

(26)     Bret Lindquist ("Lindquist"); 3478 N. Downer Ave., Milwaukee, Wisconsin.

(27)     Michael Ludwig ("Ludwig"), 924 E. Juneau Ave. No. 222, Milwaukee Wisconsin, 53202.

(28)     Jonnelli N. Naves-Gonzalez ("Gonzalez"), 2656 North Richards Street, Milwaukee, Wisconsin 53212.

(29)     Dhara Parekh ("Parekh"), 745 Waverly Lane, Wheeling, Illinois 60090.

(30)     Alex Partee ("Partee"), 2042 S. 16th St., Milwaukee, Wisconsin 53204.

(31)     Shreya Patnaik ("Patnaik"), 10005 N. Miller Ct., Mequon, Wisconsin 53092.

(32)     Syed A. Qadir ("Qadir"), 6556 S 35th Street, Franklin, Wisconsin 53132.

(33)     Vince Casimir Rolbiecki ("Rolbiecki"), 2747 N. Frederick Ave., Milwaukee, Wisconsin 53211.

(34)     Alizar S. B. Saleem ("Saleem"), 8002 W. Glenbrook Rd., Milwaukee, Wisconsin 53223.

(35)     Trevor Thomas Schermerhorn ("Schermerhorn"), 2321 E. Belleview Pl. #C Milwaukee, WI 53211

(36)     Leyton Schiebel ("Schiebel"), 2436 N. Booth St., Milwaukee, Wisconsin 53212.

(37)     William F. Schmidt ("Schmidt"), 2631 N. 71st St., Wauwatosa, Wisconsin 53213.

(38)     Taylor Q. Scott ("Scott"), 1805 East Newberry Boulevard, #2, Milwaukee, Wisconsin.

(39)     Ahmed Shehadeh ("Shehadeh"), 3492 N. Oakland Ave. Milwaukee, Wisconsin.

(40)     Mohammad Samir Siddique ("Siddique"), 610 West Wisconsin Avenue, #40, Milwaukee, Wisconsin.

5

(41)     Ryan Thomas Stetz ("Stetz"), 2426 N. Frederick Ave., Milwaukee, Wisconsin 53211.

(42)     Andrew Carlyle Urban ("Urban"), 2436 N. Fratney St; Milwaukee, Wisconsin 53212.

(43)     Kiara A. Wilson ("Wilson"), 4657 W. County Line Rd., Milwaukee, Wisconsin 53221.

(44)     Korina Yee ("Yee"), 3144 North 51st Boulevard, Milwaukee, Wisconsin.

8.     The individual plaintiffs are all representatives of a class of thousands of former and current UWM students who were commonly aggrieved by the denial of their right to organize their student government without interference from the UWM Administration, and who are well represented by the named plaintiffs.

*Defendants*

9.     The Defendants other than the DSA and Board of Regents are all adults and, on information and belief, Wisconsin residents. They are identified below by positions they occupied at times relevant hereto:

10.     Defendant Dr. Michael Lovell ("Lovell") was, prior to April 22, 2014, Chancellor of UWM, the UW institution in Milwaukee. As such, he held the powers and duties of its being its chief officer under section 36.09(3) of the statutes. Dr. Mark A. Mone ("Mone") succeeded him.

11.     Defendants Laliberte, Stockton, Thomas, McGinnity, Harbach, defendant records custodians, and Xiong in her intern capacity, were all subordinates of the UWM Chancellor, acted on authority derived from the chancellor, and were subject to the chancellor's control.

12.    Defendant Board of Regents – University of Wisconsin System (the "Board" or the "Regents") is a body politic, created by Chapter 36 of the Wisconsin Statutes, with its principal office sat 1860 Van Hise Hall, 1220 Linden Drive, Madison, Wisconsin. It is charged with oversight of UWM and the entire UW.

13.    Defendants John Behling, Mark Bradley, Jose Delgado, Tony Evers, Michael Falbo, Margaret Farrow, Eve Hall, Nicolas Harsy, Tim Higgins, Edmund Manydeeds, Regina Millner, Janice Mueller, Drew Peterson, Charles Pruitt, Anicka Purath, Jose Vasquez, David Walsh, and Gerald Whitburn (respectively "Behling", "Bradley", "Delgado", "Evers", "Falbo", "Farrow", "Hall", "Harsy", "Higgins", "Manydeeds", "Millner", "Mueller", "Peterson", "Pruitt", "Purath", "Vasquez", "Walsh", and "Whitburn") were members of the Board of Regents.

14.    Defendant Dr. Michael Laliberte ("Laliberte") was the vice chancellor for student affairs of UWM.

15.    Defendant David Stockton ("Stockton") was the Student Government Relations Coordinator and Director of the Student Association Professional Staff ("SAPS") Office of UWM.

16.    Defendant Richard Thomas ("Thomas") was Director of the UWM Union.

17.    Defendant Thomas G. McGinnity  ("McGinnity") was the Associate Dean of Students at UWM.

18.    Heather Harbach was Assistant Dean for Student Rights and Responsibilities.

19.    Pahoua Xiong was a student intern in the Dean of Students Office.

7

20.    The UWM Public Records Custodian is appointed by the UWM Chancellor. The position has been successively occupied by Amy Watson, Anthony Procaccio, Suzanne Weslow, and Julie Kipp.

21.    Defendants Edward C. Melchior ("Melchior"), Nicole Heinen ("Heinen"), Camille Ridgeway ("Ridgeway") and Robin Jens ("Jens") served as *de facto* members of the UWM Student Nonacademic Misconduct Committee, a body created by UWM under Chapter UWS 17 of the Wisconsin Administrative Code.

22.    Defendant Anthony DeWees ("DeWees"), a.k.a. Montini, was chief justice of the UWM student government.

23.    Defendant Nik Rettinger ("Rettinger") was the chair of the defendant *de facto* UWM student government.

24.    Defendant Carla Greve ("Greve") was Defendant Student Association's Independent Election Commissioner.

25.    Defendant Ryan Sorenson ("Sorenson") was, *inter alia*, Defendant Student Association's President.

### FIRST CAUSE OF ACTION

### Violation of Plaintiff Laughland's Civil Rights
### by Defendants Laliberte and Lovell in their individual capacities

26.    On April 10-12, 2012, Plaintiff Laughland was elected president of the SA. Thereafter, he had a reasonable expectation of continued employment as president for a one-year term as president starting June 1, 2012.

8

27.     On or about May 29, 2012, Defendant Laliberte, acting under color of his authority as Vice Chancellor, told Laughland that the UWM Administration would not allow him to serve as president. Laliberte had the practical power and knowing support of Defendant Lovell to effectively prohibit Laughland from enjoying the incidents of his position, including payment. A reasonable person in Laughland's position would resign. Laughland resigned on or about the second week of June, 2012. But for Laliberte's threat and the implied support of Lovell, Laughland would not have resigned.

28.     Laughland was afforded no due process before or after his removal from office. Laliberte simply informed him that he could not serve.

29.     Laughland was prevented from serving as president in retaliation for his speech and his association with those holding similar views. Instances of such speech included:

(1) At a presidential debate in early April, 2012, Laughland stated that students should "draw the line" against acceding to administration plans to fund large capital projects out of student fees.

(2) In a speech to the Student Association Senate on April 27, 2012, Laughland stated his view that students possessed legal authority co-equal to that of the UWM chancellor.

(3) During the campaign period, Laughland declined an overture from Laliberte to support a draft policy on eligibility to hold office in the SA.

30.     Laliberte and Lovell wrongfully asserted the power of their positions knowingly to deprive Laughland of his right to office without due process and in retaliation for his exercise of free speech. It was well established that such delict was a violation of Laughland's civil rights, actionable under 42 U.S.C. sec. 1983.

31.     As a result of his constructive removal from office, Laughland suffered injury in that he lost time, energy, and approximately $1000 (one thousand dollars) which he invested to secure the position; $10,000 (ten thousand dollars) in anticipated income; and loss of prestige, the powers of office, and benefit of the position to his future employment, which loss he estimates between $100,000 and $1,000,000 dollars.

## REQUESTED RELIEF

WHEREFORE Plaintiffs pray this honorable court grant them the following relief:

A.   Declaratory judgment that the interference of Laliberte was unlawful.

B.   Money damages to Laughland to be determined at trial, reflecting the total overall value of the position of SA president, with prejudgment and postjudgment interest as permitted by law.

C.   Actual attorney fees.

D.   Such other relief as the court deems appropriate.

## SECOND CAUSE OF ACTION

### Violation of Plaintiff Rolbiecki's, Scott's, and Siddique's Civil Rights by Defendants Lovell, Laliberte, Stockton, DeWees, Sorenson and Rettinger in their individual capacities

32.     On April 9-11, 2013, Nathan Uibel was elected president and Plaintiff Rolbiecki was elected vice president of the SA. Thereafter, Rolbiecki had a reasonable expectation of continued employment as vice president for a one-year term starting June 1, 2012.

33.     At the time of his election, Uibel had made binding agreements with Plaintiffs Siddique and Scott to appoint them to paid executive positions as special

assistants to the president. Thereafter, Siddique and Scott had reasonable expectations of employment beginning on or after June 1, 2012 and continuing up to one year.

34.     On or about May 3, 2013, Defendant Lovell, under color of his position as chancellor, declared in a letter that he would not recognize the 2013 SA elections or officers thereby elected, including Uibel and Rolbiecki. Under Lovell's direction, the entire elected SA was denied access to their office, budget, and all university resources. But for Lovell's action, Rolbiecki would have served as vice president, and Siddique and Scott would have served as special assistants to Uibel.

35.     On or about April 12, 2013, Defendant Laliberte, under color of his position as vice chancellor, supported Lovell's plan to deny office to Rolbiecki and other elected SA officers, by organizing an "outside review" to provide a pretext for rejecting the SA elections. Lovell and Laliberte exchanged numerous emails on and after April 13, 2013 in which they combined to advance their plan with regard to the SA elections.

36.     On April 24, 2013, Defendant David Stockton, under color of his official, knowingly supported Lovell's plan to deny office to Rolbiecki and other elected SA officers, by providing one-sided information to the "outside review" investigators and directing them to parties who would provide an exclusively negative view of the SA elections.

37.     Between May 3 and May 6, 2013, DeWees met with Laliberte and agreed to join in the administration's plan to effect the rejection of the elected SA.

On or about May 29, 2013, Defendant DeWees, under color of his authority as the Chief Justice of the University Student Court, knowingly supported Lovell's plan to to deny office to Rolbiecki and other elected SA officers, by issuing what he styled an Emergency Order by the University Student Court, purporting to enjoin Rolbiecki and the entire elected SA from taking office, and transferring their powers to the court and an interim "Board of Trustees" ("BOT").

38.     After Rolbiecki was denied the ability to serve as Vice President, the DSA did not provide him, nor Siddique or Scott, with fair representation to safeguard their rights. The DSA accepted Lovell's decree without challenge.

39.     On June 30, 2013, the members of the DSA "Board of Trustees," including Sorenson and Rettinger, met with Stockton, Laliberte and DeWees and agreed to adhere to the order removing Rolbiecki and Uibel. At this meeting, Stockton and DeWees, with the tacit support of Sorenson and Rettinger, discussed a group called the "old SA," identified with Rolbiecki, Siddique and Scott, whom they falsely described as untrustworthy, self-serving and manipulative, and having engaged in sexual harassment, racism, election fraud and attempted murder by poisoning. These messages were reinforced in later, more private meetings. At one such meeting with Stockton, Laliberte, and BOT officers, Laliberte expanded on the allegations of harassment and referred to Siddique as the "enforcer" who threatened and intimidated others on behalf of the "old SA".  In so doing, Defendants applied stigma to the removals from office suffered by Rolbiecki, Siddique and Scott.

40.     Rolbiecki, Siddique and Scott were afforded no due process concerning Uibel and Rolbiecki's removal from office, and particularly not that provided by state law or Student Court bylaws. They were not personally notified by UWM but learned through the SA that the elections and thus Siddique and Scott's pendant appointments were not going to be honored.

41.     Rolbiecki, Siddique, and Scott were each prevented from serving in retaliation for their speech and association with those with similar views. Instances of such speech became almost daily during the June 2012 to May 2013 SA year, and continue. They included:

(1) Scott's advocacy for student power in university meetings to implement section 36.09(5), before forming an independent student commission to challenge the administration proposal, with Siddique as vice chair.

(2) Siddique, from positions on the Union Policy Board and Campus Activities Board (CAB) proposing greater student control over programming and opposition to union construction without greater student input. His proposal to shift student funds from the Union to CAB led to the complaint noted in paragraph 70, below.

(3) Rolbiecki, Scott and Siddique's drafting, spoken advocacy, and votes for the student legislation identified below, paragraph 108.

(4) The online platform of the ASV student political party, for which Rolbiecki was a candidate and with which Siddique and Scott were associated, advocating a greater student role in policymaking and potential opposition to UWM Union building plans.

42.     Those defendants identified in this cause of action wrongfully asserted the power of their positions knowingly to deprive Rolbiecki, Siddique, Scott, and numerous others of their right to office without due process and in

retaliation for their exercise of free speech. It was well established that such delict was a violation of their civil rights, actionable under 42 U.S.C. sec. 1983.

43. As a result of the violation of his civil rights, Rolbiecki suffered injury in that he lost time, energy, and money which he invested to secure the position; anticipated income; and loss of prestige, the powers of office, and benefit of the position to his future employment, which loss he estimates between $100,000 and $1,000,000 dollars.

44. As a result of the violation of their civil rights, Siddique and Scott suffered injury in that they negotiated an end to their runs for president and vice president of the SA, respectively, to secure the position; anticipated income; and loss of prestige, the powers of office, and benefit of these positions to their future employment.

45. In conjunction with the violations of his civil rights among Causes of Action 2, 3, 5, and 6, Scott suffered constructive expulsion as a UWM student. But for the hostile atmosphere, threats to his rights and loss of money for tuition caused by these violations, Scott would have remained a UWM Student.

REQUESTED RELIEF

WHEREFORE Plaintiffs pray this honorable court grant them the following relief:

A. Declaratory judgment that the UWM administration's nullification of the 2013 SA Elections was unlawful.
B. Money damages to Rolbiecki, Siddique and Scott to be determined at trial, reflecting the total overall value of lost positions and violations of their First Amendment rights, with interest as permitted by law.
C. Actual attorney fees.

D.  Such other relief as the court deems appropriate.

## THIRD CAUSE OF ACTION

### Violation of Plaintiff Siddique's and Scott's Civil Rights
### by Continued Exclusion from student government by Defendants Lovell,
### Laliberte, Stockton, DeWees and Thomas in their individual capacities

46.    On May 6, 2013, Lovell met with members of the lame duck SA administration. At this meeting, Defendants Lovell and Laliberte pressured the SA to exclude Plaintiffs Siddique and Scott explicitly because of their expressed positions advocating student rights and powers, which they said "inflamed" the relationship between the student government and the administration.

47.    Defendant DeWees attended the May 6, 2013 meeting and supported Lovell and Laliberte. He argued at the meeting that once the student court approved the administration actions, there would be no remaining potential legal challenge available to the students.

48.    On June 11, 2013, Defendants Dewees and Stockton published a call for applicants to join the BOT. Applicants to the BOT were reviewed by Defendants Dewees and Stockton who determined who would be allowed to comprise the BOT.

49.    At some point between June 11 and June 16, 2013 Plaintiff Siddique applied to serve on the BOT.

50.    On June 23, 2013, Stockton rejected Siddique's application.

51.    Scott would have sought to serve on the Board of Trustees, but for a belief that his application would be futile, since he knew he had been particularly marked for exclusion.

52.     But for their explicit exclusion, Scott and Siddique would have received appointment to the BOT. Both were among the most qualified applicants based on their experience of effective service in the SA.

53.     The true reason why Siddique was excluded from the BOT, and why Scott was rejected before applying, was that they had expressed beliefs and opinions disfavored by the administration.

54.     On April 15, 2014, Defendant Thomas sent an e-mail to all student union staff stating that the Student Association officers prior to May 2013 "did all they could to keep others from getting involved in order to preserve their own power" and that "a group of students involved in the previous SA leadership" had "chosen not to participate in the current process of reform as it doesn't preserve their power and provides checks and balances on their ability to manipulate the system."

55.     This "group of students" was identified by their having put forward an alternate constitution, which Plaintiffs Scott and Siddique were promoting at the time. Because of this, and because Scott and Siddique held leadership posts in the prior SA, the email effectively identified them.

56.     Through the June 30, 2013 BOT meeting referenced in the Second Cause of Action, the April 15, 2014 email, and other similar communications, Defendants, Laliberte, Dewees and Thomas brought stigma to Siddique and Scott's non-appointment to the BOT. None of the assertions made against Siddique or Scott in these communications were true.

57.     Those defendants identified in this cause of action wrongfully asserted the power of their positions knowingly to exclude Siddique and Scott from office without due process and in retaliation for their exercise of free speech. It was well established that such delict was a violation of their civil rights, actionable under 42 U.S.C. sec. 1983.

58.     As a result of the violation of their civil rights, Siddique and Scott suffered injury in that he lost anticipated income; and powers of office, and suffered stigma associated with the allegations against the "old SA."  Plaintiffs restate the allegations of the last paragraph of the Second Cause of Action.

### REQUESTED RELIEF

WHEREFORE Plaintiffs pray this honorable court grant them the following relief:

A.  Compensatory damages to Siddique and Scott for infringing upon their rights to free speech and due process, in an amount to be determined at trial.

B.  Actual attorney fees.

C.  Such other relief as the court deems appropriate.

### FOURTH CAUSE OF ACTION

**Violation of Couto-Lain's Civil Rights
by Defendants Stockton, Lovell and Laliberte**

59.     On June 30, 2013, Couto-Lain was elected chair of the BOT. Thereafter, he had a reasonable expectation of continued employment as BOT Chair through the expected completion of its work.

60.     During Couto-Lain's tenure as BOT chair, Defendant Stockton, under color of his official positions at UWM, obstructed Couto-Lain's performance of his

duties by repeatedly refusing to provide information which it was Stockton's function to provide, such as former SA governing documents.

61.     In September 2013, Stockton, still acting under color of his official positions at UWM and by threatening to use his personal control over the fund from which BOT members were paid, organized, pressured, and convened other officers of the BOT to request Couto-Lain's resignation under threat of his removal.

62.     Couto-Lain resigned as BOT Chair. A reasonable person in his position would do so because of the intolerability of Stockton's interference and agitation against him. But for Stockton's inducement, Couto-Lain would not have resigned.

63.     Couto-Lain was afforded no due process before or after his constructive removal from office.

64.     Couto-Lain was induced to resign as BOT chair in retaliation for his speech, which included advocacy that the BOT should retain independent counsel, and that the student government should advocate for students in conflicts with the administration or faculty.

65.     On information and belief, Stockton operated with the knowledge, approval, and support of Lovell and Laliberte in orchestrating Couto-Lain's resignation.

66.     Stockton, Laliberte and Lovell wrongfully asserted the power of their positions knowingly to deprive Couto-Lain of his right to office without due process

and in retaliation for his exercise of free speech. It was well established that such delict was a violation of Couto-Lain's civil rights, actionable under 42 U.S.C. sec. 1983.

67.    As a result of the violation of his civil rights, Couto-Lain suffered injury in that he lost time, energy, anticipated income, and loss of prestige, the powers of office, and benefit of the position to his future employment.

## REQUESTED RELIEF

WHEREFORE Plaintiffs pray this honorable court grant them the following relief:

A. Declaratory judgment that the UWM administration's use of official influence to pressure Couto-Lain out of office was unlawful.

B. Money damages to Couto-Lain to be determined at trial, with prejudgment and postjudgment interest as permitted by law.

C. Actual attorney fees.

D. Such other relief as the court deems appropriate.

## FIFTH CAUSE OF ACTION

**Violation of Siddique's, Scott's, and PSA's Civil Rights by Defendants McGinnity, Xiong, Thomas, Harbach, Melchior, Jens, Heinen, Ridgeway, Sorenson, Stockton, Mone, Behling, Bradley, Delgado, Evers, Falbo, Farrow, Hall, Harsy, Higgins, Manydeeds, Millner, Mueller, Peterson, Pruitt, Purath, Vasquez, Walsh, and Whitburn by Malicious Quasi-Judicial Prosecution Based on their Protected Expression and Association**

68.    The positions held by Defendants McGinnity, Xiong, Harbach, Melchior, Jens, Heinen, Ridgeway and Mone made them part of the apparatus to investigate, review, and sanction students for nonacademic misconduct offenses under Chapter UWS 17 of the Wisconsin Administrative Code. In each instance of their conduct alleged in this cause of action, they acted under color of their positions in the UWM student disciplinary apparatus.

69.     In or including July 2013, Defendants McGinnity and Xiong, investigated and prosecuted[2] Plaintiff Scott for alleged student nonacademic misconduct in case number 2012098602.

70.     On March 8, 2013, Defendant Thomas, under color of his authority as Union Director, made a complaint against Siddique and threatened him with disciplinary proceedings in response to Siddique asking questions and making comments about his perception that Union Programming was noncompliant with regent policy. According to Thomas, this was a "threat" to union staff.

71.     Starting in or about December, 2012, Defendant McGinnity investigated Siddique regarding alleged student nonacademic misconduct in case number 2012026101. Among the allegations against Siddique in case number 2012026101 was that he misrepresented his authority and disrupted university activities by statements in which he was asserting his proper authority to help organize those activities.

72.     At the conclusion of case number 2012026101, McGinnity placed negative material in Siddique's record, suggesting he had come close to violating the rules and counseling him to change his behavior. Because this was not regarded as a sanction, it was deemed unappealable. That information was later used against him in support of other disciplinary charges against him, specifically cases number 2012098601 and 2013343702.

_____

[2] Plaintiffs use the word "prosecuted" to refer to the activity of the party in a student nonacademic misconduct proceeding who supports the sanction against the accused.

73.    Starting in or about June, 2013, Defendants McGinnity and Xiong investigated and prosecuted Siddique regarding alleged student nonacademic misconduct in case number 2012098601.

74.    On June 2, 2014, prior to the action being instituted, Defendant Sorensen wrote to Siddique and Scott threatening disciplinary action if they did not cease activities on behalf of the PSA. When Siddique did not cease, Defendant Sorenson filed a complaint which became the basis for disciplinary action in case number 2013343702.

75.    Defendant Stockton also assisted the prosecution through testimony and on information and belief, by spurring Sorensen to initiate the action.

76.    Starting in or about, June 2014, Defendant Harbach investigated and prosecuted Siddique regarding alleged student nonacademic misconduct in case number 2013343702.

77.    Among the accusations against Siddique in case number 2013343702 were: (1) that he truthfully stated that he was the president of an organization called the UWM Student Association; (2) that he truthfully communicated to the regents decisions that were made by the UWM Student Association, explaining that the UWM Student Association was not the student government recognized by the chancellor; (3) that he organized a petition against the existing student government, to form a new government, and then subsequently helped organize elections for the new government; (4) that he expressed the opinion that the DSA, which was recognized by the chancellor, was illegitimate, while the PSA, though

unrecognized by the chancellor, was legitimate; (5) that his expressions lowered the morale of officers of the Student Association at UWM; (6) that his expressions stimulated students to question whether the Student Association at UWM was legitimate.

78.     On July 11, 2014 Harbach proposed a sanction of preventing Siddique from continuing as a student or obtaining his records unless he performed community service, ceased association with the PSA, and issued a statement repudiating his belief that the PSA – not he DSA – was the legitimate student government.

79.     Siddique appealed the recommendation. The case was heard on on August 5, 7, and 14, 2014 by a hearing committee comprised of Defendants Melchior, Heinen, Ridgeway and Jens.

80.     The hearing committee issued a decision on or about August 20, 2014, imposing the sanctions as recommended by Harbach.

81.     On July 29, 2014, Siddique asked Chancellor Mone to overturn the decision, which Mone declined to do on July 31, 2014.

82.     On August 23, 2014, Siddique timely appealed to the Board of Regents, who declined to hear the appeal. The vote to decline the appeal was undertaken in closed session on November 6, 2014 with the following regents present: Defendants Behling, Bradley, Delgado, Evers, Falbo, Farrow, Hall, Harsy, Higgins, Manydeeds, Millner, Mueller, Peterson, Pruitt, Purath, Vasquez, Walsh, and Whitburn.

83. Siddique made the compelled statement ordered of him under protest, even though it violated his beliefs as a Muslim against making untrue statements. He was not forced to distribute the statement publicly because that part of the sanction was first enjoined, then rescinded. While his discipline is being appealed, Siddique has complied with restrictions on his speech and association in order to avoid being unable to continue as a UWM student.

84. On June 24, 2014, Scott, who was not taking summer classes, was informed by Defendant Harbach that he would face disciplinary charges, apparently related to the same matters as charged against Siddique in case number 2013343702, if he were to reenroll for fall semester or at any time thereafter.

85. All statements made by Siddique and Scott which formed the basis for actual and threatened disciplinary matters against them in each of the above cases were protected expressions under the First Amendment.

86. Defendants named above proceeded against Siddique and Scott in each case actually brought arbitrarily, frivolously, and in retaliation for their associations and expressions, including those referenced in paragraph 41 above.

87. The sanctions issued against Siddique in case number 2013343702 violated his freedom of association, of religion, and against compelled speech under the First Amendment.

88.     Siddique[3] was not provided with the due process required under UWS 17, university policies, and the US Constitution before being subject to university discipline. For example, in case number 2012026101, McGinnity effectively imposed a sanction and denied Siddique the right to appeal despite concluding that he had not violated any university rule, and in case number 2013343702:

(1) Siddique was denied his full right to respond at the investigatory stage, as required by the Wisconsin Administrative Code, section UWS 17.11(2);

(2) Harbach's decision did not fully identify the charged misconduct as required by UWS 17.11(2)(a)1-2 and fundamental due process, for example, finding Siddique responsible for violation of university rules without identifying the rule;

(3) Harbach's decision relied on misinterpretations of university rules, for example, by treating truthful speech that led to questions being asked of administrators as a disruption of university activities, and treating reasonable opinions as "knowingly false" statements; no prior notice had been given to students that such conduct would be considered misconduct. Siddique was denied meaningful right to be heard when the hearing committee treated Harbach's erroneous assertions of law as unrebuttable;

(4) The recommended sanction was not authorized by UWS 17.10(1); Because of this, Siddique was denied an advisor as allowed by UWS 17.12(4)(b); his right to have allegations against him be proven by clear and convincing evidence, as required by UWS 17.12(4)(f); and his appellate rights under UWS 17.13;

(5) Harbach did not comply with UWS 17.11(2)(a)2 by disclosing to Siddique the record of the investigation or all the evidence against him, and he was denied his right under UWS 17.12(3) to see all evidence given the review committee, and denied access to the hearing record as required by UWS 17.12(4)(d);

(6) The hearing committee was composed in violation of UWS 17.07(1), UWM Faculty Document 2033, other UWM policies and UWS 17.12 and 17.02(12);

---

[3] Scott was also denied due process, and UWM students are routinely denied adequate due process in these proceedings, but only Siddique among the plaintiffs here has actually been sanctioned.

(7) Siddique was denied his right to a public hearing under UWS 17.12(4)k and Wisconsin Open Meeting Law, ss. 19.81-98, Wis. Stats., when the meeting was closed to the public, and closed without a public vote (*cf.* Wis Stats. §§ 19.83, 19.85(1), closed without public notice and without explanation on the record *cf. id.* § 19.85(1), and when he was not allowed to record the meeting, *cf. id.* § 19.90;

(8) UWM, particularly Lovell and Mone and their designated subordinates including McGinnity and Harbach, did not comply with UWS 17.04, by making UWM local displinary policies freely available to students; Siddique was denied his UWS 17.11(2)(a)5 right to be supplied a copy these policies.

89.    Those defendants identified in this cause of action wrongfully asserted the power of their positions knowingly to deprive Siddique and Scott of their rights to due process, free speech, and association (and for Siddique, religion). It was well established that such delicts would be a violation of their civil rights, actionable under 42 U.S.C. sec. 1983.

90.    Plaintiffs Siddique and Scott suffered injury in that as a result of these actions, they have been forced to take time away from their economic and academic pursuits, hurting them financially and academically. They were further chilled from exercising their freedom of speech and expression. If sanctions are imposed against Siddique in case 2013343702, now presently under appeal, they will further violate Plaintiff's due process and First Amendment rights.

91.    Plaintiffs restate the allegations of the last paragraph of the Second Cause of Action.

92.    Plaintiff PSA suffered injury in that the sanctions against its president and threatened against its vice president essentially forced it to cease activity under fear that any or all of its participants would be likewise prosecuted and sanctioned.

REQUESTED RELIEF

WHEREFORE Plaintiffs pray this honorable court grant them the following relief:

A. Declaratory judgment that the UWS 17 cases noted above were wrongfully brought in the first instance against Scott and Siddique, are void *ab initio*, and therefore should be expunged and never need be self-reported.

B. Injunctive relief restraining Defendants from initiating further disciplinary actions against Scott or Siddique without advanvce approval from this court on a finding of probable cause to proceed.

C. Money damages to Scott and Siddique of an amount to be determined at trial.

D. Temporary injunctive relief, enjoining the Defendants from implementing sanctions against Siddique pursuant to his student disciplinary proceeding, until its validity is resolved.

E. Reversal of the university's decisions in case 2013343702, in which it determined that Plaintiff violated UWS 17 and that sanctions were appropriate.

F. Actual attorney fees.

G. Such other relief as the court deems appropriate.


**SIXTH CAUSE OF ACTION**

**Interference with All Plaintiffs' Right to Self-Organize
by All Defendants.**

93.     From at least April 2012 to the present and ongoing, all the defendants have collectively and individually engaged in a course of conduct of interfering with the rights of UWM students to organize themselves into a student government and advocate for student interests. Examples of actions taken as part of this course of conduct are set forth in the remainder of this cause of action.

94.     Plaintiffs repeat the allegations of the First, Second, Third, Fourth and Fifth and Seventh Causes of Action. The actions ascribed to University officials in

these causes of action individually and collectively constituted intentional violations of plaintiffs' rights under 36.09(5) to organize themselves in a manner they determine and to select their representatives. They also interfered with the students' rights to set fees and policy. Each named official had a ministerial duty to plaintiffs to refrain from such actions, and violated that duty in an official capacity.

95.    Through those actions, Plaintiffs were injured in the loss of their rights to organize.

96.    The DSA, including its officers and subunits such as the BOT and University Student Court, possessed at all times a duty to fairly represent all UWM students so long as they exercised authority purportedly derived from section 36.09(5) of the Wisconsin Statutes. In all cases herein where they aligned with administration officials interfering with student rights, these Defendants breached that duty.

**A. Rejection of Laughland.**

97.    In addition, the acts described in the First Cause of Action injured Plaintiffs Siddique, Ludwig, Laughland, Robiecki, by effectively nullifying their votes for Laughland and injured Plaintiffs Ludwig, Siddique, and Scott by negation of financial contributions they made to Laughland's campaign.

**B. Nullification of 2013 Election.**

98.    In addition to those positions noted elsewhere herein, the 2013 SA elections determined occupants of seats in the SA senate.

99.     Defendant DeWees had a ministerial duty to fairly represent all students in his capacity as chief justice of the University Student Court. DeWees violated this duty when he issued his May 29, 2013 order without notice or hearing to adversely affected parties and when he stigmatized Plaintiffs Rolbiecki, Siddique and Scott on June 30, 2013.

100.     These actions injured Plaintiffs Siddique, Ludwig, Robiecki, and Aguilar by effectively nullifiying their votes in the 2013 election. Rolbiecki, Siddique, Scott, Schiebel and Aguilar also lost positions of authority.

## C. Domination of SA Interim Government

101.     At the May 6, 2013 meeting with student leaders, Defendants Lovell and Laliberte set conditions for the resumed recognition of the SA.

102.     Throughout the tenure of the BOT in 2013 and 2014, Defendant Stockton would discuss with other administrators what they would like to see the students do, and suggest such actions to the BOT in the guise of neutral advice. Stockton would attend BOT meetings and sometimes interrupt to declare that proposed actions he disfavored would be illegal.

103.     Stockton would hold unnoticed, closed door meetings, or selectively delay or reject requests for information or other assistance to influence the course of student deliberations. He would threaten to withhold trustee stipend payments of those opposing him.

104. The actions of Defendants Lovell, Laliberte, and Stockton, as described in the immediately preceding paragraphs, constituted a violation of student plaintiffs' rights under 36.09(5) to organize themselves in a manner they determine and to select their representatives. They also interfered with the students' rights to set fees and policy. These defendants each had a ministerial duty to refrain from such actions, and violated that duty in an official capacity.

105. Defendant DeWees also claimed the unilateral power to oversee and overrule the BOT. Stockton and DeWees used the threat of use of such power to aid administration control over the BOT.

106. By adhering to the demands of Defendants Lovell and Laliberte and blindly deferring to Stockton, the DSA breached its duty of fair representation to Plaintiffs.

107. Through these actions, Plaintiffs Siddique, Scott and Couto-Lain were particularly injured by their marginalization and exclusion.

### D. Nullifying Legislation and Forcing Changes to Governing Documents.

108. The 2012-2013 SA had passed various pieces of legislation that the UWM Administration was aware of and strongly disfavored, specifically:

(1) March 3, 2013 - SB1213-025 Student Association Professional Staff Policy

(2) March 10, 2013 - SFC1213-003 SAPS Allocation;

(3) March 10, 2013 - SB1213-024 Sport Clubs Allocations Committee Bylaws;

(4) April 14, 2013 - SB1213-028 Policy on the Organization and Recognition of the Student Association of Milwaukee;

(5) April 14, 2013 - SB1213-029 Resolution Against UWM Policy No S-42.5-1

(6) April 14, 2013 - SB1213-030 Resolution on Governance Rights for University Staff in The University Personnel System;

(7) April 14, 2013 - SB1213-031 Guidelines for Differential Tuition;

(8) April 14, 2013 - SB1213-032 Union Building Committee; and

(9) April 21, 2013 - SB1213-033 Student Association Professional Staff Non-Renewal Act.

109.    Members of the UWM Administration had the ministerial duty to recognize these actions as they were exercises of student power under 36.09(5).

110.    After Lovell refused to recognize the 2013 SA election results, none of the legislation passed in the 2012-2013 term that his administration disfavored was allowed to go into effect. Such legislation was subsequently purged from the SA's archives. In at least one instance, the intent of such suppressed legislation, SB1213-028, was reversed by counter-legislation enacted by the BOT under the guidance of Stockton.

111.    On information and belief, Defendant Stockton was principally responsible for rendering such legislation inert, acting in both his individual and official capacities

112.     In each of these cases, the destruction, non-implementation, or pressure to reverse student legislation unlawfully interfered with students' rights under 36.09(5).

113.     Plaintiffs, including Rolbiecki, Scott, and Siddique, were injured in that these actions nullified the effect of measures they had written, spoken for, or voted for.  All students were denied the benefits of the legislation.

114.     After the 2013 elections, including at the May 6, 2013 meeting described above, Defendants Lovell, Laliberte and Stockton, with the cooperation of DeWees, set forth the requirement that the SA's governing documents be wholly rewritten as a precondition for being allowed to resume ordinary operations.

115.     On September 7, 2013, Defendant DeWees, acting in concert with the plans of Lovell, Laliberte and Stockton, ordered the then-in-force SA Constitution suspended.

116.     The DSA submitted a new constitution to referendum in January 2104, during enrollment period, three days after the proposed text was finalized. Each student received an e-mail ballot from the "independent" election commissioner, Defendant Greve, which included instructions to "vote yes, UWM". The administration knowingly provided Greve with this resource to help secure ratification. Each student enrolled at the time also received an email from the Administration encouraging a yes vote, and a link to a seven-minute animated commercial supporting the constitution.

117.    But for the interference of the Administration, the constitution in effect prior to the 2013 election would have been maintained.

118.    The BOT adopted further governing documents, as directed by the UWM Administration, further renouncing students' statutory power. For example, the BOT adopted new election bylaws that change elections from being student run, to being run by a commission on which faculty and administration are represented.

119.    The purported new governing documents of the Defendant SA unlawfully seek to relinquish to the administration responsibilities that must under section 36.09(5) be retained by the students, in breach of the DSA's duty to fairly represent plaintiffs. For example, the 2014 constitution:

(1) provides that SA accounts are the joint responsibility of the SA treasurer and SAPS, and that SAPS administer all financial processes;

(2) provides that SAPS coordinate the appointment of election officials and determine student eligibility for participation in student governance;

(3) provides that SAPS advise SA officers and coordinate all trainings for SA;

(4) symbolically was prepared to be signed and entered into force by the chancellor.

120.    The adoption of a new constitution without genuine student support, under administration pressure, favoring the administration and which the administration helped write, violated the right of students to organize themselves free of the administration's interference.

*E. Administrative Interference in DSA Elections and Appointments*

121.    In April 2014, the BOT held elections for the DSA.

122.    On information and belief, Stockton intervened in the election by pressuring Lavelle Young, an opponent of Defendant Sorenson for the presidency of the DSA, and a running mate of young to drop out. On information and belief, Stockton promised appointive positions to Young and his running mate in exchange for their compliance, and when Young and his running mate refused, Stockton publicized Young's running mate's GPA.

123.    On information and belief, Stockton further intervened in the election by giving Sorenson the questions and provided answers for the one presidential debate.

124.    Defendant Greve, using her position as Independent Election Commissioner, gave Sorensen special dispensation to violate campaign rules in the 2014 election. On information and belief, this was done with the advice and encouragement of Stockton.

125.    On information and belief, a subordinate of Laliberte vetoed the candidate generated by the open application process for the position of Senate Appropriations Committee chair and promoted Lavelle Young for the position.

126.    In spite of the students' right to name its own candidates to the search and screen committee that named Mone as chancellor, The DSA, by Sorenson,

complied with instructions from Stockton to name four candidates from which two were selected.

127.     Plaintiffs were injured by interference with the DSA because in lieu of the PSA being allowed to function, DSA was the only practical avenue offering even a chance to exercise limited 36.09(5) rights. In particular, Plaintiffs Kelly and Garni became DSA senators in an effort to exercise those rights in the student interest.

*F. Administrative Interference with the PSA*

128.     Plaintiffs Borkowski, Schiebel, Scott and Siddique, along with and on behalf of others, created the PSA to carry forward independent student government which had been lost to administrative interference by the nonrecognition of the 2013 elections and the creation of the DSA. They developed and proposed a new constitution and from March 27, 2014 to April 4, 2014, acquired more than 1300 UWM student signatures in support.

129.     On March 27, 2014, they asked Defendant Lovell to provide the resources for a referendum on their proposed constitution. Lovell refused to support the effort, so these students independently organized and promoted the referendum. The referendum passed in a vote held from April 6-12, 2014..

130.     Pursuant thereto, the PSA held elections from April 29 to May 1, 2014. Plaintiff Siddique was elected president. Plaintiff Scott was elected vice president, and Plaintiffs Garni, Kelly, Parekh, Patnaik, and Saleem were elected as senators.

131.    Throughout the process of organizing the PSA, the UWM Administration interfered with its ability to gather student input and support:

132.    On January 19, 2014, Plaintiffs Siddique and Scott attended a meeting of the BOT at which they asked to speak about deficiencies in its proposed referendum during the period designated for public comment. Though no other persons sought to speak, Siddique and Scott were arbitrarily limited to 120 seconds apiece, and threatened that if they exceeded their time they would be escorted out by campus police.

133.    In March 2014, Defendant Rettinger promoted the passage of a new policy restricting the posting of fliers and distribution of handbills in the UWM Union. The provision passed, giving union officials unbridled discretion to exercise prior restraint over such materials.

134.    On various occasions during the period from March 27, 2014 to April 4, 2014, students promoting the PSA including Plaintiffs Scott, Borkowski and Schiebel, were conspicuously followed by uniformed personnel of the UWM Union under the direction of Defendant Thomas, and others including Defendant Greve. On one such occasion, Plaintiffs Scott, Borkowski and Schiebel were ordered to leave the UWM Union because of their efforts to get student signatures for their petition.

135.    At some point during this period, after students promoting the PSA started to gather hundreds of petition signatures by giving class raps, in which they

were allotted time for brief announcements at the beginnings of classes, the administration circulated a memo to prohibit such raps. On information and belief, the memorandum was written and transmitted by Defendant Stockton.

136.    On April 15, 2014, Defendant Thomas sent an e-mail to all student union staff stating maligning the PSA organizers and urging students not to participate in their elections.

137.    At some point between April 12 and April 29, 2014, a UWM website providing access to a student database that had been used by PSA organizers to verify the signatures of petition signers was removed, so that it could not be used to verify identities of voters in the PSA elections. On information and belief, this was an intentional action of one or more UWM Administration defendants to hinder the PSA organizing process.

138.    During this period, Stockton, Rettinger, and unknown others removed public notices of the PSA's referendum, elections, and June 1 and June 3, 2014 meetings, which had been posted to comply with open meetings laws.

139.    At some time during this period, Defendant Stockton distributed talking points to administrators throughout the University units related to student life, to be used in speaking to students against the PSA, its constitution, and its individual promoters.

140.     At some time during this period, Plaintiffs Taylor and Siddique were subjected to flagging and blocking of their ability to use university e-mail listservs available to other students.

141.     Each of the actions described in the last nine paragraphs, as well as the disciplinary investigations listed in the Fifth Cause of Action above, were on information and belief intended to impede the ability of students to exercise their rights of self-organization.

142.     The DSA, through its officers Rettinger, Sorensen and Greve, breached its duty of fair representation to students seeking to organize the PSA, by promoting the administration's interference with DSA organizing efforts.

143.     Defendants Mone and Board, along with their subordinates, have refused to recognize Plaintiff PSA or permit it to exercise any rights under 36.09(5). As a consequence of non-recognition, the DSA has been denied ability to set budgets and make committee appointments, access resources including UWM Union office space, the budget accrued from student segregated fees for support of student government, posting of public meeting notices, or use of university internet and database resources for verification of student status and mass electronic mailing to students.

144.     The DSA, in preference to the PSA, was granted access to all these resources, except that its policymaking power was constrained.

145.     On June 3, 2014, the PSA held a senate meeting at which it enacted a segregated fee budget pursuant to 36.09(5). On or about June 4, 2014, Siddique transmitted that budget to regents for approval. Because the PSA was not recognized, Chancellor Mone and the Board of Regents ignored its budget decisions in preference to those of the DSA.

146.     The PSA was injured in that because it was denied all practical power and all access to university resources, and because the pending sanctions against Siddique in case 2013343702 made it impossible for him to exercise a leadership role, it became essentially moribund after August 2014. All fee-paying students enrolled for the following year were injured by being forced to pay greater fees than they would have under the PSA budget. Plaintiff Eisenberg and similarly situated students (those in the over 60 audit program) were injured by denying them any formal voice in university matters, which they would have obtained under the PSA constitution.

### G. Further Harms, including Imminent and Future Harms

147.     On information and belief, the DSA has or intends to: enter contracts, appoint student representatives to university shared governance committees, exercise the role of the SA in collective student government organizations such as United Council, and otherwise attempt to legally commit the student body with third parties in such a manner that its actions will become increasingly difficult to undo.

148.    Harm to Plaintiffs, and others similarly situated, will be irreparable if not ceased.

149.    Because of the imminent and ongoing irreparable harm to Plaintiffs, they lack an adequate remedy at law and must seek injunctive relief.

## REQUESTED RELIEF

WHEREFORE Plaintiffs pray this honorable court grant them the following relief:

A.    Declaratory judgment that the UWM administration's entire course of interference as described herein was unlawful, including but not limited to the UWM administration's practical nullification of the 2013 SA Elections, and the UWM administration's interference in the personnel of the BOT including the pressured removal of Couto-Lain.

B.    Consequent invalidation of all acts predicated upon or relying for their authority upon the results of such conduct.

C.    Declaratory judgment that fees imposed by the Defendant Student Association as a consequence of the nullification of the 2013 SA Elections, as well as those determined or imposed by the BOT, were improperly levied.

D.    Injunctive relief restraining Defendants from further actions relying for their authority upon the nullification of the 2013 SA Elections, or upon the official acts of the BOT.

E.    Declaratory judgment that the Board of Trustees' actions are not a reliable exercise of the student will, and not entitled to legal recognition under 36.09(5).

F.    Declaratory judgment that the composition and actions of the BOT were unlawful.

G.    Declaratory judgment reinstating the legislation herein identified.

H.    Declaratory judgment that the Defendant SA's governing documents are invalid, and that the PSA's should control.

I.    Injunctive relief restraining Defendants from further actions relying for their authority upon the validity of Defendant SA's governing documents.

J.    Temporary injunctive relief to halt the ongoing creation of new harms predicated on such interference.

K.  Such other relief as the court deems appropriate.

## SEVENTH CAUSE OF ACTION

### Violations of Public Records Laws[4]

**A. March 25, 2014 First Request: Ludwig versus Board of Regents and Custodians.**

150.    On March 25, 2014 Plaintiff Ludwig made a request for records to David Stockton, and copied to UWM Records Custodian, stating as follows:

> This is to request, under the State of Wisconsin's Public Records Law, Wis. Stat. §§ 19.31-19.39, and Regent Policy F50, II.B.3, inspection of:
>
> 1. SAPS financial documents since 2009. (detailed WISDM reports, WISDM Summaries, and any internal financial tracking documents)
>
> 2. SAPS Job Descriptions/ Position Descriptions (relevant PD's related to current staff)
>
> 3. Any document that shows number of hours worked by staff member. (time card reports, etc.)
>
> 4. Any document that shows number of hours worked by staff member by date. (time card reports, etc.)
>
> 5. Any correspondence initiated or responded to, including email, between the SAPS Office (any employee of the office) and the Vice Chancellor's or Associate Vice Chancellor's Office for Student Affairs between 1/25/13 and 4/25/13 that mentions any of the following: Mike Ludwig, Michael Ludwig, Student Association of Milwaukee, S.A.M., SA, or Student Association.
>
> 6. Any correspondence initiated or responded to, including email, that mentions or is the subject of a "super secret special assistant."
>
> 7. All public records requests SAPS has received since 1/1/2013.

---

[4] Technically, each violation creates an independent cause of action, but they are grouped here for brevity and convenience.

8. Any correspondence initiated or responded to, including email, that pertains to the Family Educational Rights and Privacy Act (FERPA).

151.    The custodian acknowledged receipt and indicated that some of the records would be provided without a fee, but never supplied responsive records.

152.    Defendant Board UWM Record Custodian violated section 19.35 by not providing the records, not stating a reason for denial and not giving notice of right to seek judicial review.

153.    Plaintiff Ludwig had a clear right to inspect and copy the records requested, and requires mandamus relief because he has no adequate remedy at law.

### B. March 25, 2014 Second Request: Scott versus Board of Regents and Custodians

154.    On March 25, 2014 Plaintiff Scott made a request for records to the UWM records custodian stating as follows:

This is to request, under the State of Wisconsin's Public Records Law, Wis. Stat. §§19.31-19.39 inspection of records, correspondence, or statements that would provide:

1. The 2013-14 fiscal year Student Association Senate Finance Committee (SFC)/(SUFAC) allocations received by the Chancellor from the Student Association.

2. The 2013-14 fiscal year Student Association Senate Finance Committee (SFC)/(SUFAC) allocations sent by the Chancellor to the Board of Regents.

3. The 2013-14 fiscal year Student Association Senate Finance Committee (SFC)/(SUFAC) allocations received by Vice Chancellor for Student Affairs Laliberte from the Student Association.

4. The 2013-14 fiscal year Student Association Senate Finance Committee (SFC)/(SUFAC) allocations sent by Vice Chancellor for Student Affairs Laliberte to the Chancellor.

5. The 2013-14 fiscal year Student Union allocations received by the Chancellor from the Union Policy Board or (via Director Thomas).

6. The 2013-14 fiscal year Student Union allocations received by Vice Chancellor for Student Affairs Laliberte from the Union Policy Board or (via Director Thomas).

7. The 2013-14 fiscal year Student Union allocations received by the Chancellor from Vice Chancellor for Student Affairs Laliberte.

8. The 2013-14 fiscal year Student Union allocations sent by the Chancellor to the Board of Regents. All of the above allocations should have been set/transmitted during the Spring of 2013.

155. The custodian acknowledged receipt but never responded in substance to the request.

156. Defendant Board and UWM Record Custodian violated violated section 19.35 by not providing the records, not stating a reason for denial and not giving notice of right to seek judicial review.

157. Plaintiff Scott had a clear right to inspect and copy the records requested, and requires mandamus relief because he has no adequate remedy at law.

**C. April 8, 2014 Request: Scott versus Board of Regents, Custodians, Laliberte and Stockton.**

158. On April 8, 2014, Plaintiff Scott made a request for records to the UWM records custodian stating as follows:

This is to request, under the State of Wisconsin's Public Records Law, Wis. Stat. §§ 19.31-19.39 inspection of:

1. Any and all emails (including those deleted and in the "Trash" folder or others deleted from that folder and backed up [or to be reconstructed] on the server, if necessary) sent or received by UW-Milwaukee Vice Chancellor for Student Affairs Michael Laliberte from 3/1/2014 to the current date (4/8/2014) containing any one of the following keywords: referendum, constitution, election, elections, petition, petitions, petitioning.

2. Any and all emails (including those deleted and in the "Trash" folder or others deleted from that folder and backed up [or to be reconstructed] on the server, if necessary) sent or received by UW-Milwaukee Student Association Professional Staff Director David Stockton from 3/1/2014 to the current date (4/8/2014) containing any one of the following keywords: referendum, constitution, election, elections, petition, petitions, petitioning.

159.    The custodian acknowledged receipt but never responded in substance to the request.

160.    Defendant Board and UWM Record Custodian violated section 19.35 by not providing the records, not stating a reason for denial and not giving notice of right to seek judicial review.

161.    Plaintiff Scott had a clear right to inspect and copy the records requested, and requires mandamus relief because he has no adequate remedy at law.

162.    Some of the records responsive to this request were withheld because they are in the actual possession of Defendants Stockton and Laliberte, who have withheld them from the custodian. To be effective, mandamus must therefore reach Defendants Stockton and Laliberte.

### D. April 30, 2014 Request: Scott versus Board of Regents and Custodian

163.    On April 30, 2014, Plaintiff Scott made a request for records stating as follows:

> This is to request, under the State of Wisconsin's Public Records Law, Wis. Stat. §§19.31-19.39 inspection of:
>
> 1. 2012-2013 WISDM Reports for all UWM segregated university fees (SUF) funded entities/departments (or the like), both allocable and non-allocable.
>
> 2. Any and all budgetary reports/proposals/requests, Departmental/Entity Presentations, and supplemental documents for/from all UWM segregated university fee (SUF) funded entities/departments (or the like, including both allocable and non-allocable) regarding the 2014- 2015 segregated university fee allocations committee (SUFAC) or allocable/non-allocable segregated fees process.

164.    The custodian never responded in substance to the request.

165.    Defendant Board and UWM Record Custodians violated section 19.35 by not providing the records, not stating a reason for denial and not giving notice of right to seek judicial review.

166.    Plaintiff Scott had a clear right to inspect and copy the records requested, and requires mandamus relief because he has no adequate remedy at law.

### E. June 19, 2014 Request: Siddique versus Board of Regents and Custodian.

167.    On June 19, 2014 Plaintiff Siddique requested of the UWM public records custodian all information used by Harbach in his disciplinary case no. 2013343702.

168.     On June 20, 2014, the custodian denied the request.

169.     Defendant Board and UWM Record Custodians violated section 19.35 by not providing the records.

170.     Plaintiff Siddique had a clear right to inspect and copy the records requested, and requires mandamus relief because he has no adequate remedy at law.

### F. July 31, 2014 Request: Siddique v. Board of Regents.

171.     On July 31, 2014, Plaintiff Siddique emailed Arcetta Knautz, an assistant dean of students who had been designated as Plaintiff's "point of contact" with regard to disciplinary case 2013343702, to request copies of the evidence against him. He received some records that day but with omissions and redactions.

172.     On August 1, 2014, Siddique emailed Knautz again to clarify why the administration refused to provide him with certain records. On August 4, 2014, Knautz responded to Siddique by referring him to University Legal.

173.     The university never provided all the requested records.

174.     Defendant Board by their designated special custodian Knautz violated section 19.35 by not providing the whole records, not stating a reason for denial and not giving notice of right to seek judicial review. The partial denial of the record was arbitrary and capricious.

175.     Plaintiff Siddique had a clear right to inspect and copy the records requested, and requires mandamus relief because he has no adequate remedy at law.

### G. August 8 and 18, 2014 Requests: Siddique versus Board of Regents and Custodian.

176. On August 8, 2014, Plaintiff Siddique emailed UWM records custodian (Anthony Procaccio), with copy to Knautz, to seek the electronic recordings of the August 5 and 7, 2014 proceedings against him in disciplinary case no. 2013343702. Procaccio never responded.

177. On August 18, 2014, Siddique emailed a successor custodian (Suzanne Weslow) and again requested the electronic recordings of the proceeding.

178. On or about September 23, 2014, provided Siddique with a recording so grossly redacted as to be almost useless. The omitted material was never provided.

179. Defendant Board and UWM Record Custodian violated violated section 19.35 by not providing all the records, imposing an unnecessary delay, stating an inadequate reason for denial ("law") and not giving notice of right to seek judicial review.

180. The partial denial of the record, and subsequent delay, was arbitrary and capricious.

181. Plaintiff Siddique requires mandamus relief because he has no adequate remedy at law.

### REQUESTED RELIEF

WHEREFORE Plaintiffs pray this honorable court grant them the following relief:

A. Mandamus to UWM Record Custodians to provide access to all legally disclosable records.

B. Statutory and exemplary damages pursuant to Chapter 19.

C. Actual attorney fees.

D. Such other relief as the court deems appropriate.

Dated this 1st day of December, 2015.

Respectfully submitted,

_____

Gary E. Grass,
Attorney for Plaintiffs

GARY E. GRASS
Attorney at Law
2132 N. 33rd Street,
Milwaukee, WI 53233
(414) 447-8369
g.grass@sbcglobal.net