# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| MOHAMMAD SAMIR SIDDIQUE,<br><br>                  Plaintiff,<br><br>v.<br><br>DR. MICHAEL LALIBERTE, DAVID STOCKTON, and RICHARD R. THOMAS,<br><br>                  Defendants. | Case No. 15-CV-1-JPS<br><br><br>**ORDER** |

In the first three years of this case's life, it broadly alleged a campaign by officials of the University of Wisconsin-Milwaukee ("UWM") to undermine students' rights to self-governance. In June 2017, the Court granted Defendants' motion to dismiss the action on several grounds, including failure to effectuate service, state-law immunity, and improper joinder. *UWM Student Assoc. v. Lovell*, 266 F. Supp. 2d 1121 (E.D. Wis. 2017). The Court of Appeals reversed in part, finding that the case should not have been dismissed for misjoinder. *UWM Student Assoc. v. Lovell*, 888 F.3d 854, 864 (7th Cir. 2018). Instead, it instructed the Court to permit the students an opportunity to elect which of their claims they wished to proceed on, with the remainder to be dismissed. *Id.*

The Court gave the students that choice, directing them to file an amended complaint asserting only one set of properly joined claims. (Docket #53). In this, the fourth amended complaint, the only remaining plaintiff is Mohammad Samir Siddique ("Siddique"), a former UWM undergraduate, and the only remaining defendants are UWM officials

Michael Laliberte ("Laliberte"), David Stockton ("Stockton"), and Richard Thomas ("Thomas"). Siddique—who is proceeding *pro se* after the students' former counsel was suspended from the practice of law—asserts two claims. (Docket #55). First, he alleges that Defendants violated the First Amendment by retaliating against him for criticizing Stockton and advocating for increased student government power and autonomy. The retaliation came in the form of rejecting Siddique's application to serve on the on the Board of Trustees ("BOT"), a student government body created in 2013, as well as false accusations of misconduct and other stigmatization in the UWM community. Second, he claims that by rejecting his application for the BOT, Defendants deprived him of a property or liberty interest without due process, in violation of the Fourteenth Amendment.

Defendants have moved to dismiss the fourth amended complaint. (Docket #56). That motion is fully briefed and, for the reasons stated below, it will be granted in part and denied in part.

1. **BACKGROUND**

At UWM, there previously existed a student government body known as the Student Association ("SA").[1] Siddique was a prominent

---

[1]Student government within the University of Wisconsin system emanates in large measure from Wis. Stat. § 36.09, which reads, in pertinent part:

> The students of each institution or campus subject to the responsibilities and powers of the board, the president, the chancellor, and the faculty shall have primary responsibility for advising the chancellor regarding the formulation and review of policies concerning student life, services, and interests. Students in consultation with the chancellor and subject to the final confirmation of the board shall have the responsibility for the disposition of those student fees which constitute substantial support for campus student activities. The students of each institution or campus shall have the right to organize themselves in

member. According to him, the SA was quite independent from the university administration in its decision-making, and UWM student-affairs officials were aggravated by the gall of students to disagree with their preferred policies. School administrators sought to undermine the SA by invalidating the body's spring 2013 election results with bogus allegations of fraud—substantiated by an equally spurious "independent review" of the election performed by a committee of officials and students from UW-Whitewater. The UWM officials leading this effort included the chancellor and the Board of Regents, as well as the three defendants in this case: Laliberte, the Vice Chancellor for Student Affairs; Stockton, the Coordinator for Student Government Relations; and Thomas, the Director of the UWM Student Union.

The UW-Whitewater review panel concluded that Siddique and his student government party, which controlled all or nearly all of the SA, sought to perpetuate themselves in office at the expense of an open and fair election. UWM administrators used the investigation as a pretext to nullify the election results and create an interim student government body, led by the BOT, over which they would be able to exercise greater control. As with the SA, student positions on the BOT were paid. At a meeting with the deposed SA leaders in May 2013 regarding the creation of the BOT, UWM chancellor Michael Lovell and Laliberte pressured the SA to exclude

---

a manner they determine and to select their representatives to
participate in institutional governance.

*Id.* § 36.09(5). Siddique and his fellow students have rallied under Section 36.09(5), calling it a broad grant of authority and autonomy to students for self-governance. Defendants, of course, disagree, noting that students' rights are expressly curtailed by the involvement and oversight of university administrators.

Siddique from future participation in student government because of his strong advocacy for student self-government rights.

In June 2013, despite this pressure from the administration, Siddique applied for appointment to a position on the BOT. His application was reviewed and rejected by Stockton and a UWM student, Anthony Dewees. Siddique alleges that Stockton assessed whether applicants had a history of supporting strong students' rights, not whether they were qualified. Siddique, who had been outspoken in his advocacy for students' rights and his criticism of Stockton personally, says he was rejected for these reasons and not for his credentials.

In particular, Siddique alleges that during the 2012–2013 academic year, he was a proponent for withdrawing the SA from a shared governance committee at UWM because the committee sought to deprive students of their self-government rights. After withdrawing from the shared governance committee, the SA formed its own commission to advocate for students' rights, and Siddique served as the commission's vice chair. Additionally, Siddique served on other student government bodies and in student political parties in which he advocated for more robust student self-governance, even in the face of university opposition. Finally, Siddique sponsored and voted in favor of SA legislation in early 2013 which criticized Stockton and accused him of unlawfully interfering in student government.

Siddique alleges that these were the impetus for his rejection from the BOT. He believes that, but for Defendants' ill will and decision to categorically exclude him from the BOT for his prior advocacy, he would have been selected, as he "was among the most qualified applicants based on experience of effective service in the SA." (Docket #55 at 8).

In addition to his rejection from the BOT, Siddique details two other episodes of retaliation by UWM officials. First, in late June 2013, the newly constituted BOT held an orientation session. At the session, Stockton, Laliberte, and other, unnamed individuals "falsely alleged that the previous student government, the 'old SA' consisted of members who had engaged in sexual harassment, racism, election fraud and attempted murder by poisoning, and corruptly attempted to perpetuate themselves in office." *Id.* These false accusations were repeated in later meetings between BOT leaders, Stockton, and Laliberte, including an allegation that Siddique was an SA "enforcer" who threatened and intimidated those who opposed it. *Id.*

Second, on April 15, 2014, Thomas sent an email to all student union staff stating that the former SA's officers worked to preserve their own power at the expense of others and undermined the student government's system of checks and balances. Siddique alleges that it was easy to identify this derogation with him, as he was within the small group of former SA leaders and was publicly known to have advocated for an alternate SA constitution. Siddique views the email as a confirmation that he was denied the BOT position because of false allegations of corruption. This email, along with the June 2013 BOT meeting and "other similar communications," represents in Siddique's mind Defendants unfairly stigmatizing and deriding him for his non-appointment to the BOT. *Id.* at 9.

2. **LEGAL STANDARD**

Federal Rule of Civil Procedure 12(b)(6) provides for dismissal of complaints which fail to state a viable claim for relief. Fed. R. Civ. P. 12(b)(6). To state a viable claim, a complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief."

Fed. R. Civ. P. 8(a)(2). In other words, the complaint must give "fair notice of what the. . .claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted). The allegations must "plausibly suggest that the plaintiff has a right to relief, raising that possibility above a speculative level[.]" *Kubiak v. City of Chi.*, 810 F.3d 476, 480 (7th Cir. 2016) (quotation omitted).

In reviewing the complaint, the Court is required to "accept as true all of the well-pleaded facts in the complaint and draw all reasonable inferences in favor of the plaintiff." *Id.* at 480–81. However, a complaint that offers "'labels and conclusions'" or "'a formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555). The Court must identify allegations "that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 679. The Court is further obliged to give Siddique's *pro se* allegations, "'however inartfully pleaded,'" a liberal construction. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)).[2]

3.   **DISCUSSION**

While Siddique harbors a mistaken view of the reach of due process, in view of the leniency afforded to *pro se* litigants, the Court concludes that his First Amendment retaliation claim can proceed past the pleading phase.

---

[2] It is clear that Siddique's former counsel drafted the fourth amended complaint, not Siddique himself. Siddique explains that the lawyer "would otherwise [have] file[d] the instant pleading himself" but for his suspension. (Docket #55 at 1 n.1). Surely counsel would not have filed a complaint drafted by his client. Thus, it is strange to grant the present complaint, drafted by a lawyer, the leniency afforded to *pro se* pleadings. Yet the rule speaks in terms of who filed the document in question; it does not give the Court discretion to look behind the filer for a ghostwriter.

The Court will address each of Defendants' arguments in turn, though not in the order they present them.

### 3.1 Due Process Claim

At the outset, the Court can dismiss Siddique's claim for violation of his right to due process. The Fourteenth Amendment prohibits state officials from depriving individuals of life, liberty, or property without due process of law. *Colon v. Schneider*, 899 F.2d 660, 666 (7th Cir. 1990). Such a claim requires the plaintiff to establish "(1) a cognizable liberty or property interest; (2) the deprivation of that interest by some form of state action; and (3) the failure to employ constitutionally adequate procedures." *Dietchweiler by Dietchweiler v. Lucas*, 827 F.3d 622, 627 (7th Cir. 2016). Siddique's claim fails on the first element, as he enjoyed no constitutionally protected interest in appointment to the BOT.

To be entitled to due process, a plaintiff must have a liberty or property interest at stake; not every deprivation rises to the level of a constitutional concern. Protectible property interests "are not created by the Constitution. Rather, they are created and their dimensions defined by an independent source such as state statutes or rules entitling the citizen to certain benefits." *Goss v. Lopez*, 419 U.S. 565, 572–73 (1975). Further, when examining these sources for qualifying interests, the Supreme Court has instructed that "a person clearly must have more than an abstract need or desire for [a benefit]. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972).

Siddique's qualifications for the BOT position do not equate with entitlement. Even assuming he was the best candidate, it does not follow that some state law or other authority guaranteed him the position he

sought or so confined Stockton's review that Stockton should have had no choice but to hire him. Siddique identifies no such authority. The Seventh Circuit has held that applicants for prospective employment nearly always lack a protectible property interest in being hired. *Moore v. Muncie Police & Fire Merit Comm'n*, 312 F.3d 322, 326–27 (7th Cir. 2002); *Petru v. City of Berwyn*, 872 F.2d 1359, 1363 (7th Cir. 1989) (firefighter had no property interest in promotion even though he was highest-ranked candidate). Siddique's unilateral belief that he was a superlative applicant is not enough to invoke constitutional protections, as it does not rise to the level of a "mutually explicit understanding" between the parties that he would be selected. *Crim v. Bd. of Educ. of Cairo Sch. Dist. No. 1*, 147 F.3d 535, 545 (7th Cir. 1998).

Indeed, his interest in prospective employment is noticeably less compelling than an interest in continued employment, which is the usual factual scenario in due process cases. *See Perry v. F.B.I.*, 781 F.2d 1294, 1300 (7th Cir. 1986); *Omosegbon v. Wells*, 335 F.3d 668, 674 (7th Cir. 2003). Even individuals who are actually hired but are discharged during a probationary period have a difficult time establishing the existence of a property interest. *See Farmer v. Lane*, 864 F.2d 473, 479 (7th Cir. 1988). As explained below, while UWM officials might contravene the First Amendment by rejecting Siddique in retaliation for his speech, that does not mean that he had a right to serve on the BOT in the first place. *See O'Hare Truck Serv., Inc. v. City of Northlake*, 518 U.S. 712, 716–17 (1996) ("[A]lthough a policeman 'may have a constitutional right to talk politics. . .he has no constitutional right to be a policeman[.]'") (quoting *McAuliffe v. Mayor of New Bedford*, 29 N.E. 517, 517 (Mass. 1892)).

Siddique relies not only on his rosy view of his qualifications, but also on Wis. Stat. § 36.09(5), which he believes entitles him to participation in student government. (Docket #58 at 11). He is mistaken. The statute broadly defines the rights of students to govern themselves subject to permissible rules imposed by school administrators. *See* Wis. Stat. § 36.09(5); *supra* note 1. It says nothing of the BOT or applicants for BOT appointments; in fact, it says nothing about individual students being employed in any specific position within any body or group whatsoever. Siddique recognizes this in his complaint, noting that the statute affords rights to "the student body." (Docket #55 at 3). Section 36.09(5) does not give Siddique or any other particular student a constitutionally cognizable entitlement to participate in a certain student government group. *See Miller v. Crystal Lake Park Dist.*, 47 F.3d 865, 867 (7th Cir. 1995) ("A 'legitimate claim of entitlement' is one that is legally enforceable—one based on statutes or regulations containing 'explicitly mandatory language' that links 'specified substantive predicates' to prescribed outcomes.") (quoting *Kentucky Dep't of Corr. v. Thompson*, 490 U.S. 454, 463 (1989)).

Nor has Siddique plausibly alleged the deprivation of a liberty interest. In the employment context, a plaintiff may establish the deprivation of a liberty interest by showing damage to his "good name, reputation, honor, or integrity," *Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971), but the alleged stigma "must take concrete forms and extend beyond mere reputational interests," *Omosegbon*, 335 F.3d at 675 (citing *Paul v. Davis*, 424 U.S. 693, 711–12 (1976)). Thus, the plaintiff "must show that the government distinctly altered his legal status in addition to tarnishing his good name." *Roake v. Forest Preserve Dist. of Cook Cnty.*, 849 F.3d 342, 347 (7th Cir. 2017). Siddique cannot make this showing; by failing to hire him

for the BOT position, Stockton did not alter Siddique's existing legal status, such as might occur if he was fired from a position he was presently holding. *Id.* Siddique calls the failure to hire him a "loss of employment," (Docket #58 at 11), but the two are materially different. He had no job that was taken from him, nor any entitlement to it.

Moreover, Siddique would have to prove more than that he was "not [hired] in one particular job." *Perry v. Sindermann*, 408 U.S. 593, 599 (1972). Instead, the damage to his reputation must be so severe that "it becomes virtually impossible for [him] to find employment in his chosen field," for at that point "the government has infringed upon that individual's liberty interest to pursue the occupation of his choice." *O'Gorman v. City of Chi.*, 777 F.3d 885, 891 (7th Cir. 2015). In this instance, Siddique complains that UWM officials stigmatized him, but there is no rational inference from the allegations that he was deprived of other employment opportunities at the university. Certainly, it cannot be said that participation in the student government was Siddique's "occupation," even if it was among his extracurricular interests.

Having no constitutionally protected property or liberty interest at stake, Siddique was entitled to no process at all before being denied the BOT appointment. Consequently, this claim must be dismissed.[3]

---

[3] Along with his opposition to Defendants' motion, Siddique proposed the filing of a fifth amended complaint in the event the Court found that it solved the problems Defendants identified in the fourth. *See* (Docket #58-1). The fifth amended complaint includes additional allegations about the lack of process afforded before Siddique's rejection from the BOT, but nothing in it suggests that state law or a mutually explicit understanding between the parties gave him something more than a unilateral hope of being hired. Nor does the fifth amended complaint plausibly allege that his legal status was altered by Defendants' disparagement. Allowing amendment would not insulate the claim against a

### 3.2 First Amendment Retaliation

Siddique's remaining claim is for retaliation against him for engaging in constitutionally protected speech. To prevail on a First Amendment retaliation claim, the plaintiff must show that "(1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation that would likely deter First Amendment activity in the future; and (3) the First Amendment activity was 'at least a motivating factor' in the defendant's decision to take the retaliatory action." *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009) (quoting *Woodruff v. Mason*, 542 F.3d 545, 551 (7th Cir. 2008)). Here, assuming Siddique's allegations are true and taking all reasonable inferences in his favor, it is clear that he engaged in protected speech and that his speech was the predominant factor in Defendants' decision-making.[4]

The parties' dispute turns instead on the second factor: whether Defendants did something in retaliation for Siddique's speech that would deter a reasonable person from future, similar speech. In his complaint,

---

future motion to dismiss on these grounds. As such, amendment would be futile, and the Court will not allow it. *Foman v. Davis*, 371 U.S. 178, 181–82 (1962); *Crestview Vill. Apts. v. U.S. Dep't Of Housing & Urban Dev.*, 383 F.3d 552, 558 (7th Cir. 2004); *Garcia v. City of Chi.*, 24 F.3d 966, 970 (7th Cir. 1994).

[4] Siddique views his former position on the SA and his prospective position on the BOT as employment. It is an open question whether he could be considered an employee of the university and, if so, whether his speech as part of his duties as an SA officer enjoys diminished constitutional protection for that reason. *See Comsys, Inc. v. Pacetti*, 893 F.3d 468, 471 (7th Cir. 2018) ("[A] public employee cannot use the First Amendment to block (or get damages for) a discharge that follows things the worker said as part of the job.") (citing *Garcetti v. Ceballos*, 547 U.S. 410, 422 (2006)). Defendants did not make this argument and the Court declines to undertake that analysis without the benefit of adversarial development, as it is unclear the extent to which the doctrine might apply to a university student operating as a student government official.

Siddique focuses on his rejection from the BOT as the primary adverse action at issue. But woven throughout the allegations is another theory: that Defendants' derogatory statements chilled his free speech rights, separate and apart from the BOT rejection. Under the lenient standard of review applicable at this juncture, the Court finds that both theories can proceed.

### 3.2.1 Rejection from the BOT

An employer cannot retaliate against a person by refusing to hire him for a position because of his protected speech. *George v. Walker*, 535 F.3d 535, 538 (7th Cir. 2009). Liberally construing Siddique's allegations, it is no stretch to infer that Stockton rejected his application to the BOT in substantial part because of his advocacy for students' rights, his participation in the SA, and his attacks on Stockton personally. Defendants think that Siddique's examples of his protected speech, and their connection to his rejection, are conclusory and speculative, but the Court does not share that view. Siddique has offered more than "bare allegations of malice" and has instead connected specific speech acts with ensuing retaliatory actions, supporting an inference of improper motive. *Harlow v. Fitzgerald*, 457 U.S. 800, 817 (1982). His allegations far exceed those in *Dewey v. University of New Hampshire*, 694 F.2d 1, 3–4 (1st Cir. 1982), where a university professor could not proceed on a claim that he was forced into retirement in retaliation for unspecified conversations on matters of public concern over the course of six years prior to his discharge. Considering that this is a *pro se* submission, it easily crosses the plausibility threshold. *Iqbal*, 556 U.S. at 678; *Duncan v. Duckworth*, 644 F.2d 653, 655 (7th Cir. 1981) ("Where the challenged complaint is one that has been prepared without the benefit of legal expertise, it must be liberally construed to determine whether it" states a viable claim for relief).

Defendants maintain that Laliberte and Thomas cannot be sued under this theory for a separate reason: they lacked personal involvement in the decision to reject Siddique's application. *Alejo v. Heller*, 328 F.3d 930, 936 (7th Cir. 2003) ("A plaintiff bringing a civil rights action must prove that the defendant personally participated in or caused the unconstitutional actions."). But in view of the fact that they were high-level administrators involved in student affairs, were intimately involved in the retaliatory dismantling of the SA, and knew of and disliked Siddique's advocacy, it can be inferred that Stockton acted at their direction or with their knowledge and consent. *Smith v. Rowe*, 761 F.2d 360, 369 (7th Cir. 1985); *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995). This is particularly true for Laliberte, who was Stockton's superior. Thus, this portion of the claim may proceed against all Defendants for the present.

### 3.2.2 Stigmatization in the Student Community

Siddique's second retaliation theory is that Defendants viciously defamed him in retaliation for his speech. Here, Siddique points to Stockton and Laliberte's salacious allegations at the June 2013 BOT meeting and after, and Thomas' derogatory statements in his April 2014 email. Normally retaliatory speech is actionable "only in situations of threat, coercion, or intimidation that punishment, sanction, or adverse regulatory action will immediately follow." *Novoselsky v. Brown*, 822 F.3d 342, 356 (7th Cir. 2016). Siddique does not allege that he was threatened with punishment, only demeaned and slandered, rendering him a pariah in the student government community.

Isolated instances of public ridicule will not amount to actionable retaliatory harassment unless they are egregious enough to deter a person of ordinary firmness from exercising his right to speak. For example, in

*Hutchins v. Clarke*, 661 F.3d 947, 956–57 (7th Cir. 2011), the Seventh Circuit found that former Milwaukee County Sheriff David Clarke's statements on a radio show about a deputy who had criticized him did not amount to retaliation. In that case, Clarke publicly accused his employee of being a slacker and falsely suggested that the deputy had been disciplined for sexual harassment. *Id.* The Court of Appeals observed that Clarke's statements did not threaten punishment, and that "[e]ven if some 'harassment and ridicule' might be retaliatory speech under § 1983, Sheriff Clark[e]'s statements did not rise to that level." *Id.* at 956–57 (quotation omitted). After all, courts must balance the plaintiff's right to speak without fear of retaliation against the defendant's own right to free speech. *Id.* at 956; *see also Novoselsky*, 822 F.3d at 356 ("Unconstitutional retaliation by a public official requires more than criticism or even condemnation."). That said, sufficiently humiliating or opprobrious statements will sustain a retaliation claim, such as in *Bloch v. Ribar*, 156 F.3d 673, 679–80 (6th Cir. 1998), where a sheriff disclosed intimate details of a rape over the radio to embarrass the victim. *See Hutchins*, 661 F.3d at 957.

Here, the complaint alleges that Defendants falsely accused Siddique of sexual harassment, attempted murder, corruption, and fraud. These appear to have been isolated, though humiliating, comments. Yet, given the applicable standard of review, the Court finds that the claim deserves further development in discovery. *See Chapman v. Yellow Cab Coop.*, 875 F.3d 846, 848 (7th Cir. 2017) (emphasizing generosity afforded to *pro se* litigants when evaluating a motion to dismiss). Elaboration as to what precisely was said and when will allow a more fulsome assessment of whether the comments were sufficiently egregious to amount to actionable retaliation.

Similarly, the Court finds that Defendants' retaliatory speech might be actionable under a theory that it amounted to a "campaign of petty harassments." *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982). In her concurrence in *Hutchins*, Judge Williams noted that the Seventh Circuit has long recognized that retaliation can occur in the absence of a threat and in the absence of a single reproachful comment. *Hutchins*, 661 F.3d at 958 (Williams, J., concurring). Where an employer makes his employee's life miserable through a long course of petty indignities, diminished work assignments, or false accusations of misconduct, a retaliation claim may lie. *Id.* (citing *DeGuiseppe v. Vill. of Bellwood*, 68 F.3d 187, 192 (7th Cir. 1995)). Those precedents might support Siddique's retaliation claim even if the individual speech acts are not so offensive as to satisfy *Hutchins*. Again, further development in discovery is warranted to flesh out the facts for a comparison against the pertinent legal standards.

For the reasons stated above, the Court will deny Defendants' motion to dismiss Siddique's First Amendment retaliation claim.

### 3.3 Remaining Arguments

The Court has determined that Siddique's First Amendment retaliation claim has plausible merit. Because of this, the Court must now address Defendants' other, more generalized arguments for dismissing Siddique's suit. None of them hold water.

First, as in their prior motions to dismiss, Defendants contend that the fourth amended complaint is not short and plain, as Rule 8 requires. (Docket #57 at 7–9); Fed. R. Civ. P. 8(a)(2) (a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief"). While prior complaints were inscrutable tomes, the present

complaint is only twelve pages long. (Docket #55). Thus, its length does not raise Rule 8 concerns.

Further, the Court rejects Defendants' claim that the complaint is unintelligible. They say that Siddique does not identify which Defendants performed which acts, or which Defendants are sued under which theory, but the Court's factual recitation and its discussion herein demonstrate that this is untrue. At a minimum, under its obligation to liberally construe *pro se* submissions, *Erickson*, 551 U.S. at 94, the Court was able to make out enough of the story to find that this claim can proceed past the pleading stage. Moreover, Siddique has withdrawn his vague allegation seeking a declaratory judgment for "the UWM administration's use of official influence" to bar him from student government, which was one of Defendants' primary sticking points. (Docket #58 at 3).

Second, though Siddique does not specify whether he brings claims against Defendants in their individual or official capacities, this is not a fatal flaw, contrary to Defendants' assertion. (Docket #57 at 19–20). In Section 1983 actions, the presumption is that a claim is brought against a state official in his individual capacity if not specified, as the Eleventh Amendment bars damages claims against state officials sued in their official capacities. *Brokaw v. Mercer Cnty.*, 235 F.3d 1000, 1009 (7th Cir. 2000). The allegations here bear out this conclusion. Unlike prior complaints, Siddique does not seek injunctive relief, so there is no reason to consider this an official-capacity suit. *See Hill v. Shelander*, 924 F.2d 1370, 1374 (7th Cir. 1991); *Ameritech Corp. v. McCahn*, 297 F.3d 582, 586 (7th Cir. 2002).

Third, Defendants seek dismissal on the basis of qualified immunity. (Docket #57 at 20–22). Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate

clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow*, 457 U.S. at 818. To surmount the defense, Siddique must show: (1) that the facts as alleged amount to a violation of a constitutional right; and (2) the right at issue was clearly established at the time of Defendants' misconduct. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). Both elements are satisfied by the allegations of the fourth amended complaint for purposes of Siddique's First Amendment claim. As detailed above, he has alleged conduct that amounts to unlawful retaliation for his protected speech, and longstanding appellate precedent prohibits officials from refusing to hire a person because of his protected speech or from making sufficiently humiliating comments about him. Further, it must be remembered that qualified immunity is disfavored as a reason for dismissal at the pleading stage. *See Jacobs v. City of Chi.*, 215 F.3d 758, 765 n.3 (7th Cir. 2000). The defense may be raised again at summary judgment if the facts support it.

Finally, Defendants offer a one-paragraph assertion that Siddique lacks standing to sue because he has no legally protected interest in participation on the BOT. (Docket #57 at 18–19). Whether he has standing to bring a due process claim is irrelevant, as that claim lacks legal merit in any event. *See supra* Part 3.1. For purposes of his First Amendment claim, however, Siddique enjoys standing to redress violations of his constitutional rights even if his damages ultimately are nominal. *Kyle v. Patterson*, 196 F.3d 695, 697 (7th Cir. 1999). Put simply, while Siddique had no due process entitlement to the BOT position, he had a right not to be rejected in retaliation for his protected speech. *Perry*, 408 U.S. at 597 ("[E]ven though a person has no 'right' to a valuable governmental benefit and even though the government may deny him the benefit for any number

of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech.").

4. **CONCLUSION**

While Siddique's due process claim falters on threshold legal requirements, he has offered sufficient factual allegations to support his claim for retaliation for his protected speech under the First Amendment. That claim may proceed, and the Court will contemporaneously set a scheduling conference in order to provide the parties with the timeline for the expeditious conclusion of this case.

Accordingly,

**IT IS ORDERED** that Defendants' motion to dismiss the fourth amended complaint (Docket #56) be and the same is hereby **GRANTED in part** and **DENIED in part** as stated herein.

Dated at Milwaukee, Wisconsin, this 1st day of October, 2018.

BY THE COURT:

_____
J.P. Stadtmueller
U.S. District Judge