# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| MOHAMMAD SAMIR SIDDIQUE,<br><br>Plaintiff,<br><br>v.<br><br>DR. MICHAEL LALIBERTE, DAVID STOCKTON, and RICHARD R. THOMAS,<br><br>Defendants. | Case No. 15-CV-1-JPS<br><br>**ORDER** |

This action arises from a contested student government election at the University of Wisconsin-Milwaukee ("UWM"). On July 2, 2018, Plaintiff submitted a fourth amended complaint alleging that his civil rights were violated when Dr. Michael Laliberte, ("Laliberte"), David Stockton ("Stockton"), and Richard R. Thomas ("Thomas") (collectively, "Defendants") excluded him from student government in retaliation for his protected speech regarding students' rights to self-governance. (Docket #55).[1] On January 15, 2019, Defendants moved for summary judgment. (Docket #70). The motion is now fully briefed. For the reasons explained below, the Court finds in favor of the Defendants and will grant their motion for summary judgment.[2]

---

[1] Plaintiff also alleged due process violations, which Defendants successfully moved to dismiss. (Docket #60).

[2] Plaintiff's unopposed motions for an extension of time and for leave to file summary judgment responses instanter (Docket #78 and #79) will be granted.

1. **STANDARD OF REVIEW**

Federal Rule of Civil Procedure 56 provides that the Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). A fact is "material" if it "might affect the outcome of the suit" under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The Court construes all facts and reasonable inferences in the light most favorable to the non-movant. *Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 360 (7th Cir. 2016). The Court must not weigh the evidence presented or determine credibility of witnesses; the Seventh Circuit instructs that "we leave those tasks to factfinders." *Berry v. Chi. Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010). The party opposing summary judgment "need not match the movant witness for witness, nor persuade the [C]ourt that [his] case is convincing, [he] need only come forward with appropriate evidence demonstrating that there is a pending dispute of material fact." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 921 (7th Cir. 1994).

2. **RELEVANT FACTS**

Plaintiff was a student at UWM from fall 2011 to spring 2016, during which time he was very active in student government. All three defendants worked for UWM's administration during that time. Laliberte worked in the Student Affairs department; Stockton worked as a "Student Government Relations Coordinator" or a "Student Service Coordinator;" and Thomas served as the Director of the Student Union. Stockton, who reported to several people in the administration including Laliberte, was

employed to provide advice and services to the Student Association ("SA"), a student government body.[3] Plaintiff was a well-known member of the SA, and an outspoken opponent of the university's leadership. He was a tireless advocate for students' rights to self-govern, and promoted student government autonomy from UWM's administration. Plaintiff helped wage a successful university legislative campaign to defund Stockton's position. He also helped pass student legislation that withdrew support for construction for a new student union. In the 2012-2013 school year, he worked with a group of students in the SA to elect more agents of change into leadership positions. The campaign was successful, and in spring 2013, victors aligned with Plaintiff's causes were elected to student government offices. These activities, and Plaintiff in particular, caused great chagrin to Thomas, Laliberte, and Stockton, who desired a student government that was more collaborative with and deferential to the administration.

Following UWM's student government election, UWM's Chancellor commissioned a review of the election results by two University of Wisconsin-Whitewater (UWW) staff members and one UWW student.

---

[3]As stated in prior orders, the university of Wisconsin's student government system derives from Wis. Stat. § 36.09, which reads, in pertinent part:

> The students of each institution or campus subject to the responsibilities and powers of the board, the president, the chancellor, and the faculty shall have primary responsibility for advising the chancellor regarding the formulation and review of policies concerning student life, services, and interests. Students in consultation with the chancellor and subject to the final confirmation of the board shall have the responsibility for the disposition of those student fees which constitute substantial support for campus student activities. The students of each institution or campus shall have the right to organize themselves in a manner they determine and to select their representatives to participate in institutional governance. *Id.* § 36.09(5).

Based on this investigation, the Chancellor concluded that the election results were invalid. Plaintiff took issue with the integrity of the review and the conclusion. He provides evidence that Stockton was at least minorly involved in the investigation. (Docket #80-1 at 3).

On May 29, 2013, the UWM Student Court enjoined the supposed victors from taking office, and mandated a new election be held in October 2013. In the interim, the Student Court determined that a student Board of Trustees would govern in lieu of the SA. The Student Court established a process by which students could apply for positions as representatives to the Board of Trustees. Shortly thereafter, an online application for Board of Trustee representative positions was made available. The Student Court's orders were issued in consultation with the administration, in which Defendants played an active role. The application form for the Board of Trustees positions enumerated qualifications that applicants would need to meet in order to be appointed as representatives, but did not explicitly include a minimum enrollment requirement. (Docket #89 at 7).

The Board of Trustees representative contract contained additional requirements of student representatives. It required student representatives to maintain a minimum GPA of 2.0, be in good standing with the school, and read and sign the contract. There is an issue of fact as to whether this contract, with these requirements, actually accompanied the earliest iteration of the application. This is not material. It is undisputed that the contract did not indicate that the office would check for enrollment. (Docket #89 at 8).

Stockton screened applicants for their eligibility as Board of Trustee representatives, and forwarded all eligible applications to the Student Court. Stockton acknowledges that he was active in the eligibility

assessment process, in which he checked for GPA, enrollment, and disciplinary standing, then created an Excel sheet of all eligible and ineligible applicants . (Docket #80-1 at 5–6). He also helped draft the contract and a code of conduct, and worked very long hours throughout the process. (Docket #80-1 at 15).

Plaintiff completed the online application form and submitted it through UWM's online portal for student groups. Plaintiff was enrolled during the spring 2013 semester, which ended on May 19, 2013. As of June 2013, he had not enrolled in any summer 2013 or fall 2013 semester courses. Plaintiff did not enroll for the fall 2013 semester until August 19, 2013. Plaintiff admits that he was not enrolled at UWM in June 2013, but he was nevertheless registered as a student (i.e., he had paid the registration fee to reserve his place at the university). Ostensibly because Plaintiff was not, at the time of his application, currently enrolled as a student, he did not meet the criteria for a Board of Trustees representative position. Plaintiff received notice of his application's rejection by email on June 23, 2013. The rejection letter listed possible reasons for the rejection, one of which was insufficient enrollment. Immediately after Plaintiff received notice of his application's rejection, he began to suspect that it was in retaliation for his critical speech about the administration.

Throughout the university system, there is a policy requiring students to meet enrollment criteria before they can be involved in certain extra-curricular activities. The policy in effect at the time of these events, (the "F50 policy"), required "all leadership position in the organizations be held by students enrolled on a fee-paying basis at least half-time. . .'half-time' status means enrollment for a minimum of six credits as an undergraduate student. . ." (Docket #80-6 at 22). The UWM Student Status

Determination Policy states that a half-time student in the spring or fall must be enrolled in 6-11 credits, while a half-time student in the summer only needs to be enrolled in 3-5 credits. (Docket #80-7 at 15). (By contrast, a full-time student in the fall or spring requires a minimum of 12 credits, but only 6 credits in the summer.) *Id.* The Status Determination Policy also states that "[i]n order to be fully enrolled for a term, a student must be enrolled as of the day after the add deadline in that term; *prior to that date, a student is considered registered but not fully enrolled.*" *Id.* at 16 (emphasis added). Thus, in order for either a full-time *or* a half-time student to be considered "fully enrolled," they must be enrolled as of the day after the add deadline in that term.

The deadline for adding/dropping courses for fall semester was September 16, 2013. (Docket #80-8 at 8, 11). Throughout that summer, it seems there were a series of add/drop deadlines based on the particular summer session in which a person was enrolled. *Id.* at 4. Plaintiff has provided some evidence that the F50 policy requiring students in organizations to be enrolled in at least 6 credits was inconsistently applied to continuing students over summer sessions. Specifically, former student government members attested that they were not aware of the school actively checking a student's enrollment status, or permitting or revoking permission to participate in a student group on that basis. (Docket #86 at 2, Docket #84 at 1–2). One affiant attested that, to his best recollection, he was not "fully enrolled" when he was selected to serve on the Board of Trustees, because he was a new student who had not been at UWM the previous semester. (Docket #85 at 2–3). He remembers that he, like Plaintiff, had paid the registration fee, but did not select classes until later in the summer. *Id.*

When the newly formed Board of Trustees convened, Stockton and Laliberte cautioned new representatives against listening to "old SA" members, who were characterized as being disruptive and intimidating. (Docket 80-1 at 17–18). Plaintiff was referred to by name at least once, and was called "The Enforcer" of the "old SA" by Laliberte. *Id.* at 18. Stockton and Laliberte also spoke about the nefarious activities of the "old SA," and mentioned incidents such as sexual harassment, embezzlement, and hazing, without historically contextualizing these more egregious activities as events from the distant past. (Docket #80-1 at 17).[4]

In 2014, Thomas sent an email to the Student Union referencing an unnamed "group of students involved in the previous SA leadership" who were attempting to put forth an alternate system of government because they had "chosen not to participate in the current process of reform," which was difficult for them to "manipulate." Plaintiff claims that as a result of Defendants' actions, his speech has been chilled. For example, he felt reluctant to recruit allies, because he knew they risked becoming targets if they associate with him. (Docket #86 at 3).

**3. ANALYSIS**

To prevail on a First Amendment retaliation claim, Plaintiff must show that "(1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation that would likely deter First Amendment activity in the future; and (3) the First Amendment activity was 'at least a motivating factor' in the defendant's decision to take the retaliatory action." *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009) (citing *Woodruff v. Mason*,

---

[4]Plaintiff alleges that the statements were about racism and attempted murder, but has not provided any evidence in support.

542 F.3d 545, 551 (7th Cir. 2008) (quoting *Massey v. Johnson*, 457 F.3d 711, 716 (7th Cir. 2006)). In assessing a deprivation's deterrent effect, courts consider whether "a person of ordinary firmness" would feel able to continue First Amendment activity. *Bridges*, 557 F.3d at 552, 555. "Whether retaliatory conduct is sufficiently severe as to be actionable is a question of fact, unless it is so trivial that it would not deter a person of ordinary firmness from the exercise of the right." *Black v. Clarke*, 285 F. Supp. 3d 1070, 1083–84 (E.D. Wis. 2018) (citing *Wallace v. Benware*, 67 F.3d 655, 663 n.9 (7th Cir. 1995); *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982)).

Plaintiff's speech, which criticized UWM's student government and administration, is presumed to be protected, and Defendants have not advanced any arguments to the contrary. The issues on summary judgment are whether the following actions qualify as retaliation that would deter a person of ordinary firmness from speaking: (1) Plaintiff's rejected application to the Board of Trustees as a student representative, and (2) Defendants' speech about Plaintiff to the school community.

### 3.1 Retaliation

#### 3.1.1 Rejected Application

In this Circuit, "retaliation need not be monstrous to be actionable under the First Amendment." *Deguiseppe v. Vill. of Bellwood*, 68 F.3d 187, 192 (7th Cir. 1995). "It is well established that an act in retaliation for the exercise of a constitutionally protected right is actionable under Section 1983 even if the act, when taken for different reasons, would have been proper." *Howland v. Kilquist*, 833 F.2d 639, 644 (7th Cir. 1987) (quoting *Buise v. Hudkins*, 584 F.2d 223, 229 (7th Cir. 1978)). To overcome a motion for summary judgment, Plaintiff must provide evidence that Stockton and Laliberte rejected his application in retaliation for his political speech, and

that this rejection would have deterred a person of ordinary firmness (if not Plaintiff himself) from continuing this speech.[5]

There are sufficient disputes of fact as to whether Plaintiff's rejected application was retaliatory. Stockton and Laliberte characterized Plaintiff and his party as disruptive, aggressive, and intimidating. Stockton, one of Laliberte's supervisees, was the subject of one of Plaintiff's legislative efforts, and Stockton's job was jeopardized as a result of Plaintiff's actions. Stockton was also tasked with screening applicants for eligibility for the Board of Trustees, which was intended to replace Plaintiff's vigilante SA. A reasonable jury could find that Stockton and Laliberte had a motive to prevent Plaintiff from serving on the Board of Trustees, and Stockton's function as a gatekeeper facilitated that objective.

Additionally, Plaintiff has provided some evidence from people familiar with the student government processes who attest that the enrollment requirement was not typically enforced for summertime student government participants. Of course, it is not necessarily illegal for an organization to apply a policy that affects all individuals uniformly. *See*

---

[5] The parties agree that Thomas's liability extends only to the retaliatory speech. (Docket #80 at 3). Laliberte's connection to the retaliatory rejection is more attenuated, but Plaintiff has provided a recording of Laliberte discussing the new student government and opining about the types of students who should be included and excluded, which is evidence that he "direct[ed] or consent[ed] to the challenged conduct." *Doyle v. Camelot Care Centers, Inc.*, 305 F.3d 603, 615 (7th Cir. 2002); *see also* "Chancellor Meeting 5-6-13 (Full)," https://vimeo.com/77028693. Defendants argue that this evidence is unauthenticated and therefore inadmissible, but the standard for evidence on summary judgment is whether the evidence could be presented in an admissible form. Fed. R. Civ. P. 56(c)(2); *Wragg v. Vill. of Thornton*, 604 F.3d 464, 466 (7th Cir. 2010). If the recording could be authenticated—and Defendants have suggested no reason why it could not—then Laliberte's statements would be admissible as an opposing party statement. Fed. R. Evid. 801(d)(2).

*e.g.*, *Grossbaum v. Indianapolis-Marion Cty. Bldg. Auth.*, 100 F.3d 1287, 1295 (7th Cir. 1996) (observing that "retaliation case law demonstrates that retaliation causes of action are challenges to the *application* of governmental rules, not to the rules themselves."). Defendants claim that they applied the enrollment criteria equally to all applicants. However, one affiant who was appointed to the Board of Trustees believes that he may not have been enrolled when his application was accepted because he was a new student and did not enroll for classes until later in the summer. Additionally, a review of UWM's registration and enrollment dates supports the conclusion that some continuing students would have been involved in activities over the summer without technically meeting the enrollment criteria, strengthening the inference that this rule was speciously applied to Plaintiff. Defendants, on the other hand, have provided evidence that they appointed former SA members to the Board of Trustees, including several people who were supporters of Plaintiff's policies, which weakens the inference that Plaintiff's critical speech was the motivating factor behind his rejection. The evidence at summary judgment must be construed in the light most favorable to the non-moving party, and the evidence presented—however debatable a jury may find it—is not so feeble that the Court can dismiss Plaintiff's rejection as a bureaucratic oddity. *C.f. Kidwell v. Eisenhauer*, 679 F.3d 957, 969 (7th Cir. 2012); *Kulumani v. Blue Cross Blue Shield Ass'n*, 224 F.3d 681, 685 (7th Cir. 2000). A reasonable jury could find that Defendants arbitrarily employed this policy against Plaintiff and rejected his application as a result of his critical speech, and that a reasonable person would feel deterred from further engaging in such critical speech.

### 3.1.2 Retaliatory Speech

Typically, retaliatory speech is actionable in situations where there is "'threat, coercion, or intimidation that punishment, sanction, or adverse regulatory action would immediately follow.'" *Hutchins v. Clarke*, 661 F.3d 947, 956–57 (7th Cir. 2011). Isolated instances of public ridicule will not amount to actionable retaliatory harassment unless they are egregious enough to deter a person of ordinary firmness from exercising his right to speak. *Id.* "In certain cases, a public official may also face liability where he retaliated by subjecting an individual to 'embarrassment, humiliation, and emotional distress.'" *Novoselsky v. Brown*, 822 F.3d 342, 356 (7th Cir. 2016) (quoting *Bloch v. Ribar,* 156 F.3d 673, 678–80 (6th Cir. 1998)); *Hutchins*, 661 F.3d at 957. This "high bar" is "usually limited to the release of 'highly personal and extremely humiliating details' to the public." *Novoselsky*, 822 F.3d at 356 (citing *Hutchins*, 661 F.3d at 957). In other words, "[u]nconstitutional retaliation by a public official requires more than criticism or even condemnation." *Novoselsky*, 822 F.3d at 356.

Here, Plaintiff provides evidence that Defendants characterized him as intimidating and disruptive. This does not constitute retaliatory speech that violates the First Amendment. Defendants' tales of former SA members being involved in embezzlement, sexual harassment, and hazing also do not rise to the level of retaliatory speech. Moreover, Plaintiff's claim that these statements were intended to humiliate him is conclusory and unsupported by evidence. Plaintiff was not identified in those statements, and the events that Defendants spoke about had, in fact, happened in recent years. The Court infers that this comment was made in the context of a discussion regarding the SA to which Plaintiff belonged, which is why Plaintiff took umbrage. Perhaps Defendants saw Plaintiff's SA's political

activities in the same negative light that they saw Plaintiff's predecessors' more disreputable activities. This may be unfair, but it does not give rise to a constitutional violation. Finally, there is no embarrassment or humiliation to be found in Thomas's email regarding an unnamed group of students who attempted to "manipulate" the student government. Not only does the email fail to reference Plaintiff, but the substance of the email is not embarrassing, humiliating, or emotionally distressing, and it strains credulity that such statements would deter a person of ordinary firmness from continuing their protected speech. Even in aggregate, these statements do not rise to the level of a constitutional violation. *Novoselsky*, 822 F.3d at 356–57 ("However impolitic [the public official's] statements may have been, they did not rise to the level of threat, coercion, intimidation, or profound humiliation.").

### 3.2  Qualified Immunity

Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Put simply," says the Supreme Court, "qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). To surmount the defense, Plaintiff must show: (1) that the facts as alleged amount to a violation of a constitutional right; and (2) the right at issue was clearly established at the time of Defendants' misconduct. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009); *Jones v. Wilhelm*, 425 F.3d 455, 461 (7th Cir. 2005). Once the defense is raised, the plaintiff bears the burden to defeat it. *Weinmann v. McClone*, 787 F.3d 444, 450 (7th Cir. 2015).

To overcome an assertion of qualified immunity, Plaintiff must proffer facts which, if believed, amount to an actual violation of his constitutional rights. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). A reasonable jury could find, based on the evidence, that Defendants acted in retaliation when they rejected Plaintiff's application to the Board of Trustees. Next, Plaintiff must show that the violation of his constitutional rights was "clearly established under applicable law at the time and under the circumstances that the defendant official acted." *Easterling v. Pollard*, 528 Fed. App'x 653, 656 (7th Cir. 2013) (citing *Pearson*, 555 U.S. at 232). A right is clearly established if "a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). In other words, a right is clearly established if it would be obvious to a reasonable state actor that "what they are doing violates the Constitution, or if a closely analogous case establishes that the conduct is unconstitutional." *Siebert v. Severino*, 256 F.3d 648, 655 (7th Cir. 2001). Factually identical precedent is not necessary; the guiding question is whether the official would have had "fair warning" that the conduct was unconstitutional. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). "In determining whether a defendant's alleged actions violated a clearly established right, courts may properly take into account any information the defendant ought reasonably to have obtained." *Jones*, 425 F.3d at 461.

Wis. Stat. § 36.09(5) delineates students' rights to actively participate in student government processes. The statute allows students to organize themselves in "a manner they determine" and "to select their representatives to participate in institutional governance." *Id.* However, the students' participation in governance is "subject to" the responsibilities and powers of the board, the president, the chancellor and the faculty. The

statute makes clear that "subject to" means "subordinate to." *Id.* § 36.09(3m).

Few cases interpret the scope of the statute. In *Student Ass'n of Univ. of Wis.-Milwaukee v. Baum*, 246 N.W.2d 622 (Wis. 1976), the Wisconsin Supreme Court considered whether a student association had statutory authority to appoint members to three different committees, or whether the chancellor retained authority to make such appointments. The court held that the student association had the exclusive right to appoint various committee members. In so holding, the court acknowledged that the right to organize and the right to select representatives are integrally related—to hold otherwise would mean that the administration could "thwart the authority of the organization and deal with other students more to its liking." *Id.* at 295. The court determined that the legislature's intent in drafting this statute was to ensure that these rights were "free of administrative interference." *Id.* at 296. Similarly, in *Oshkosh Student Ass'n v. Bd. of Reg. of Univ. of Wis. Sys.*, 279 N.W.2d 740, 742 (Wis. Ct. App. 1979), the Wisconsin Court of Appeals affirmed that students had the right to appoint their own representatives to a committee formed to make recommendations for the university's next chancellor. These cases reinforce the right of the student association to select their own representatives for various committees, but do little to shed light on the issue at hand.

The propriety of the invalidated elections and the creation of the Board of Trustees is not before the Court. Rather, the Court must determine whether, under those circumstances (i.e., an invalidated election and the creation of a temporary governing body), the Defendants should have known that they could not prevent a student from participating in that temporary governing body. It is a close call—on the one hand, it is well-

established that the state cannot act in retaliation against a person who speaks critically of it. On the other hand, while students have the power to appoint their own representatives to various committees, the extent of an administrator's power under Wis. Stat. § 36.09(5) to curb a student's involvement in government is not clear. While Plaintiff's right to engage in criticism of his university is well-established, his right to participate in student government under all circumstances is not. Given the Supreme Court's instruction that qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law," and in light of the lack of evidence that the Defendants *knowingly* violated the law, the Court is constrained to find that qualified immunity applies. *Mullenix*, 136 S. Ct. at 308 (citations and quotations omitted).

4. **CONCLUSION**

In light of the foregoing, the Court will grant Defendants' motion for summary judgment on the basis of qualified immunity. Consequentially, Defendants' motion to stay trial and pretrial deadlines (Docket #92) will be denied as moot.

Accordingly,

**IT IS ORDERED** that Defendants' motion for summary judgment (Docket #70) be and the same is here by **GRANTED**;

**IT IS FURTHER ORDERED** that Plaintiff's motion for extension of time (Docket #78) be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that Plaintiff's motion for leave to file summary judgment responses instanter (Docket #79) be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that Defendants' motion to stay trial and pretrial deadlines (Docket #92) be and the same is hereby **DENIED as moot**; and

**IT IS FURTHER ORDERED** that this action be and the same is hereby **DISMISSED with prejudice**.

The Clerk of the Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 10th day of April, 2019.

BY THE COURT:

_____
J.P. Stadtmueller
U.S. District Judge